571 F.2d 390
 FIRST WISCONSIN MORTGAGE TRUST, a Massachusetts Business
Trust, Plaintiff- Appellee,
v.
FIRST WISCONSIN CORPORATION, a Wisconsin Corporation, First
Wisconsin Mortgage Company, a Wisconsin Corporation, and
First Wisconsin National Bank of Milwaukee, a National
Banking Association, Defendants-Appellants.
 No. 77-1786.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 25, 1977.
Decided Feb. 24, 1978.
Rehearing In Banc Granted April 20, 1978.
 
 H. Templeton Brown, Chicago, Ill., for defendants-appellants.
 Bernard J. Nussbaum, Linda C. Harris, Chicago, Ill., Laurence C. Hammond, Jr., Milwaukee, Wis., for plaintiff-appellee.
 Before CASTLE, Senior Circuit Judge, COWEN, Senior Judge,* and PELL, Circuit Judge.
 CASTLE, Senior Circuit Judge.
 
 
 1
 This appeal presents two novel issues involving the effect of an order disqualifying counsel: whether substitute counsel is entitled to have access to the predisqualification work product of prior counsel; and, in the first instance, whether this court has jurisdiction to hear an appeal from the district court's order denying such access. Finding that this court has jurisdiction to consider this appeal, we affirm.
 
 I.
 
 2
 Plaintiff First Wisconsin Mortgage Trust (Trust) was established in 1971 under the sponsorship of defendant First Wisconsin Corporation (FWC). Trust is a real estate investment trust whose purpose is to provide investors with an opportunity to invest in a portfolio of mortgage and real estate investments. Trust was advised on the investments by defendant First Wisconsin Mortgage Company, a wholly-owned subsidiary of FWC, and was jointly involved in various loan transactions with defendant First Wisconsin National Bank, also a subsidiary of FWC.
 
 
 3
 From the time it was established until September, 1974, the law firm of Foley & Lardner was general counsel to Trust as well as general counsel to FWC and its subsidiaries. During 1973 and 1974 certain of the loan transactions became troubled when the borrowers experienced financial difficulty. Trust hired its present attorneys as special counsel regarding the problem loans in February, 1974. The present suit was filed in March, 1975 with Trust claiming that the defendants violated certain sections of the federal securities laws and regulations. Trust refused to consent to Foley & Lardner's continuing representation of the defendants and on August 4, 1975 moved to disqualify Foley & Lardner as defendants' counsel. That motion was granted on November 16, 1976. First Wisconsin Mortgage Trust v. First Wisconsin Corporation, 422 F.Supp. 493 (E.D.Wis.1976) (disqualification order).
 
 
 4
 On December 15, 1976, defendants' substitute counsel entered an appearance and filed a notice of appeal of the disqualification order. On January 7, 1977, substitute counsel requested the district court to hold a pretrial conference to discuss defendants' access to the "work product" generated by Foley & Lardner prior to their disqualification. The work product sought consists of Foley & Lardner's analysis and review of several hundred real estate investment transactions which were prepared by 15 lawyers over a one year period and an explanation thereof. The district court declined to hold the conference reasoning that it had been deprived of jurisdiction upon the filing of the notice of appeal. The defendants moved for voluntary dismissal of the appeal of the disqualification order January 20, 1977 and entered into negotiations regarding the work product with the plaintiff.
 
 
 5
 On February 7, 1977, defendants moved the district court "For Authorization To Request Access To Certain Foley & Lardner Work Product." This motion was denied on June 14, 1977. First Wisconsin Mortgage Trust v. First Wisconsin Corporation, 74 F.R.D. 625 (E.D.Wis.1977) (work product order). Defendants filed a timely notice of appeal of the work product order and also requested the district court to certify the order for interlocutory appeal under 28 U.S.C. § 1292(b). The certification request was denied on September 15, 1977. Plaintiff's August 17, 1977 motion to dismiss the appeal for lack of jurisdiction was taken under advisement together with the merits at oral argument.
 
 II.
 
 6
 We consider first plaintiff's motion to dismiss this appeal for lack of jurisdiction. Plaintiff argues that defendants' appeal from the work product order is improper since that order is not a final judgment under 28 U.S.C. § 1291.[1] Moreover, plaintiff claims the defendants have failed to meet the requirements of the "collateral order" doctrine which tempers the rigidity of the final judgment rule. Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). First, plaintiff argues that denial of access to the work product of prior counsel is not the type of irreparable harm which is needed to invoke the collateral order doctrine. Second, it is contended that Cohen does not allow appellate review of the district court's exercise of discretion in denying the work product motion. Third, plaintiff claims that the work product order merely construed the prior disqualification order and that an order construing an otherwise appealable order is not by itself appealable.[2] While the work product order is obviously not a final disposition of the entire suit under the strict terms of § 1291, we find that we have jurisdiction to hear this appeal under the collateral order doctrine.
 
 
 7
 The Cohen case recognized an exception to the general rule that an order must dispose of the entire controversy between the parties before that order is appealable as a final judgment under § 1291.[3] This court has interpreted Cohen and its progeny as establishing four requirements all of which must be satisfied before an interlocutory decision can be considered "final" within the meaning of the collateral order doctrine:
 
 
 8
 (1) the order must present an important and unsettled question of law;
 
 
 9
 (2) the order could not be reviewed effectively on appeal from the final judgment of the entire action since the right claimed in the order would have been lost;
 
 
 10
 (3) the subject of the order must be separate and independent from the subject of the main cause of action; and
 
 
 11
 (4) on balance, the danger of denying justice by delay outweighs the inconvenience and costs of piecemeal review.
 
 
 12
 E. g., Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 171, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); Weit v. Continental Illinois National Bank and Trust Co., 535 F.2d 1010, 1014-15 (7th Cir. 1976); Rosenfeldt v. Comprehensive Accounting Service Corp., 514 F.2d 607, 610 n. 3 (7th Cir. 1975); Allegheny Airlines, Inc. v. LeMay, 448 F.2d 1341, 1345 (7th Cir.), cert. denied, 404 U.S. 1001, 92 S.Ct. 565, 30 L.Ed.2d 553 (1971); 9 J. Moore, Federal Practice P 110.13(5), at 170 (2d ed. 1975). Applying these requirements has obtained different results with different orders. See United States ex rel. Hi-Way Electric Co. v. Home Indemnity Co., 549 F.2d 10 (7th Cir. 1977) (order denying stay of enforcement of judgment is appealable); Anschul v. Sitmar Cruises, Inc., 544 F.2d 1364 (7th Cir.), cert. denied, 429 U.S. 907, 97 S.Ct. 272, 50 L.Ed.2d 189 (1976) (order denying class action status is not appealable). Schloetter v. Railoc of Indiana, Inc., 546 F.2d 706 (7th Cir. 1976), which held an order disqualifying counsel to be appealable, is the decision most similar to the present action. However, the current order denying a party access to the work product of its disqualified counsel raises different considerations and thus the Cohen requirements must be separately analyzed.
 
 
 13
 Turning to the first requirement, we find that the order denying the defendant access to the work product of his disqualified counsel presents an important and unsettled question of law. As noted above, the issue is one of first impression in this circuit and, to our knowledge, has not been addressed by any other circuit court of appeals. Also, as suggested in oral argument, increasing business and legal complexities as well as heightened sensitivity to ethical standards potentially will result in more disqualifications of counsel and, presumably, more questions regarding the status of predisqualification work.
 
 
 14
 Plaintiff's second argument is apparently directed at this "importance" requirement. Plaintiff contends that the work product order is discretionary and thus the district court's decision in other cases involving similar orders would depend upon "factual variations (that) are so numerous that a judgment on appeal can do little to establish meaningful standards." Donlon Industries v. Forte, 402 F.2d 935, 937 (2d Cir. 1968). In our view, however, once the disqualification decision has been made, the factual differences surrounding the issue of access to work product are few. Questions of content presumably have been resolved in the district court's finding that the prior representation was substantially related to the subject of the present suit. See Schloetter v. Railoc of Indiana, Inc., supra, at 710. Questions of when the disqualification possibility arose and the effect of that timing are not so numerous as to preclude appeal on "discretion" grounds. Nor do we accept plaintiff's similar argument that the defendants seek only pretrial discovery and that discovery orders are never within the collateral order doctrine. While we question the flat assertion that discovery orders never fall under the Cohen exception, see Carter Products, Inc. v. Eversharp, Inc., 360 F.2d 868 (7th Cir. 1966), we do not view the work product request here as "discovery" of an adversary's case. Rather, defendants here are requesting the work of prior counsel; access to which has been made uncertain by the disqualification order.
 
 
 15
 The second requirement of the collateral order doctrine is also satisfied since the right not to be required to duplicate the work of counsel will be lost if postponed until final judgment. Even if the defendant were to prevail in the main suit, it would be required to pay twice for a single benefit and that expense could not be recovered. The plaintiff's initial argument is that such expense is not "irreparable" under the authorities. Blackie v. Barrack, 524 F.2d 891 (9th Cir. 1975), cert. denied, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). If the burden imposed were the normal cost of attorney fees in a suit, this case might be different. However, here the defendants are being required to suffer the extraordinary expense of paying twice for the same legal work. Once that expense has been endured, the issue becomes unreviewable for mootness. Cf. Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 717, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967) (American rule forbids recovery for attorney fees).
 
 
 16
 As to the third requirement of Cohen, there appears to be no dispute that the issue of access to work product is separate and independent of the underlying suit which is based upon alleged securities laws violations. The right claimed, to be spared double attorney fees, "is not an ingredient of the cause of action and does not require consideration with it." Cohen v. Beneficial Loan Corp., supra, 337 U.S. at 546-47, 69 S.Ct. at 1226.
 
 
 17
 The fourth requirement is a subjective determination that the potential injury to the appellant outweighs the time-honored policy against piecemeal appeals. We do not feel that the general policy will suffer significantly if this appeal is heard, while the hardship to the defendant in having to duplicate extensive legal work is great. Therefore, we find that under the circumstances present in this case, the balance is properly struck in favor of review.
 
 
 18
 Thus we find that the work product order, standing alone, meets the four requirements of the collateral order doctrine.
 
 
 19
 Plaintiff's third argument in favor of dismissing this appeal, that an order construing an appealable order is not appealable, is more difficult. We do not agree, as a general proposition, that it is improper to invoke the Cohen rule in all cases where one order construes another.[4] Rather plaintiff's stronger contention here is that defendant waived its right to review by not pursuing an appeal of the disqualification order. In this light, plaintiff suggests that defendants should have sought clarification of the disqualification order through Fed.R.Civ.P. 52(b) and 59(e) within 10 days of that judgment and then appealed or that defendants could have appealed the disqualification order directly and, if necessary, secured a limited remand to clarify the lower court's intent.[5]
 
 
 20
 Either of the alternatives suggested requires that the work product order be characterized as merely a part of the prior disqualification order. Given the course of the proceedings in this case, we are not prepared to say that the work product order was so obviously a subpart of the prior order as to find the defendants waived their right to appeal under the collateral order doctrine. The disqualification order did not address the work product issue.[6] In addition, although the disqualification order was entered on November 11, 1976, defendants did not retain substitute counsel until December 15, 1976.[7] This was after the 10-day period to move for clarification under Rules 52(b) and 59(c) had passed. Substitute counsel filed notice of appeal immediately on December 15, 1976 in order to preserve defendants' rights under the 30-day filing requirement of Fed.R.App.P. 4(a). On January 7, 1977, defendants' substitute counsel wrote a letter to the district court requesting a pretrial conference regarding future access to the Foley & Lardner work product. When informed of the district court's opinion that it lacked jurisdiction to hold the pretrial conference, the defendants voluntarily dismissed the appeal in order to resolve the work product question. These facts show that defendants' substitute counsel, after becoming more familiar with their clients' position, viewed the work product question to be the important issue. Substitute counsel were also of the opinion that the work product question could not be resolved by the appeal of the disqualification order since it had not been definitely raised in the district court. Thus, although the procedures suggested by the plaintiff might be the proper method to raise the issue of work product access after attorney disqualification in future cases, since the issue is one of first impression and it was not clearly resolved in the disqualification order, we find the work product order to be a separate order which satisfies the requirements of the collateral order doctrine.[8] Accordingly, plaintiff's motion to dismiss this appeal is denied.
 
 III.
 
 21
 We now turn to the merits of this appeal and consider whether the district court's denial of access to predisqualification work product was proper.[9] The district court, in its scholarly opinion, reasoned that such access should be refused because allowing substitute counsel to use the Foley & Lardner work product would constitute continuation of Foley & Lardner's representation of the defendants in violation of the disqualification order.[10] We note that the district court has the power and the primary responsibility for supervising the conduct of attorneys who practice before it and, consequently, review of the work product order by this court is limited to determining whether there has been an abuse of discretion. Schloetter v. Railoc of Indiana, Inc. supra at 710; Ceramco, Inc. v. Lee Pharmaceuticals, 510 F.2d 268, 271 (2d Cir. 1975); Richardson v. Hamilton International Corp.,469 F.2d 1382, 1385-86 (3d Cir. 1972), cert. denied, 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973).
 
 
 22
 The general principles involved in determining whether to disqualify attorneys for conflicts of interest, and, we submit, in interpreting the effect of such disqualifications, are contained in Canons 4 and 9 of the ABA Code of Professional Responsibility.[11] Canon 4 states that a lawyer should preserve the confidences and secrets of a client and Canon 9 states that a lawyer should avoid even the appearance of impropriety. These ethical principles are designed to protect the interests of the individual client as well as the public confidence in the judicial system.[12] The policy encouraging full and frank discussion between an attorney and his client requires the client have complete faith that his legitimate secrets will never be used against him. See Schloetter v. Railoc of Indiana, Inc., supra at 711. All doubts must be resolved in favor of protecting that private information.[13] Any less would result also in a loss of public confidence:The Preamble to the Canons of Ethics admonishes the members of the bar that their conduct should be such as to merit the approval of all good men. That conduct should not be weighed with hair-splitting nicety. We have found no exceptions to the exhortation to "abstain from all appearance of evil." 1 Thessalonians 5:22.
 
 
 23
 United States v. Trafficante, 328 F.2d 117, 120 (5th Cir. 1964).
 
 
 24
 Defendants concede that the appearance of impropriety is sufficient to disqualify an attorney. However, defendants' main contention on this appeal is that where no confidential information actually has been used in the development of prior counsel's work product, preventing the present client from having access to the legal work is improper. We find two faults with this logic. First, in cases where a lawyer is disqualified for prior representation of a current adversary, it is unnecessary to establish that the lawyer actually possessed confidential information of the former client; such possession is presumed. Schloetter v. Railoc of Indiana, Inc., supra at 710. See generally Note, Ethical Considerations When An Attorney Opposes A Former Client: The Need For A Realistic Application Of Canon Nine, 52 Chi-Kent L.Rev. 525 (1975). We find no reason to change this presumption when interpreting the effects of attorney disqualification. Questions regarding the extent of permissible involvement by a disqualified attorney in postdisqualification proceedings should be resolved in accordance with the same principles as applied in the original disqualification decision.
 
 
 25
 Second, in making this argument, defendants expressly assume that the withdrawal of disqualified counsel cures any appearance of professional impropriety. However, the essence of an attorney's representation of a client is his "mental impressions, conclusions, opinions or legal theories," or, in other words, his work product. Hickman v. Taylor, supra note 9, 329 U.S. at 508 & 511, 67 S.Ct. at 392. To say that a lawyer's physical presence gives the appearance of impropriety while the use of his work product does not is to immerse oneself in the same "hair-splitting niceties" which properly have been condemned in the enforcement of ethical standards. United States v. Trafficante, supra at 120. See also Emle Industries, Inc. v. Patentex, Inc., supra note 13 at 571.
 
 
 26
 Defendants further argue that the work product sought here should be viewed in the same light as the pleadings, interrogatories, and other written materials generated by counsel in preparation for trial. They contend that disqualification should not require that the slate be wiped clean retroactive to the date when prior counsel began the conflicting employment. While there might be a point where an attorney's acts are so ministerial or otherwise unobjectionable to the former client that such work could be used by substitute counsel after disqualification, we are not compelled to draw that line in the present case. The work product sought here, Foley & Lardner's analyses and legal memoranda concerning the subject loan files is too closely connected with disqualified counsel to be considered unobjectionable.[14]
 
 
 27
 The two cases primarily relied upon by defendants do not support their claim to have access to prior counsel's work product after disqualification. In Allied Realty of St. Paul, Inc. v. Exchange National Bank of Chicago, 408 F.2d 1099 (8th Cir.), cert. denied sub nom., Abramson v. Exchange National Bank of Chicago, 396 U.S. 823, 90 S.Ct. 64, 24 L.Ed.2d 73 (1969), the court refused to ban the subsequent use of information obtained by disqualified counsel who had been a government attorney in a related criminal action. The court reasoned that the information sought was public or otherwise discoverable. See also Allied Realty of St. Paul, Inc. v. Exchange National Bank of Chicago, 283 F.Supp. 464, 470 (D.Minn.1968). Foley & Lardner's work product here is neither public information nor freely discoverable under Fed.R.Civ.P. 26(b)(3) and thus Allied is distinguishable.
 
 
 28
 Nor does E. F. Hutton & Co. v. Brown, 305 F.Supp. 371 (S.D.Tex.1969), aid defendants. There, the court disqualified certain law firms from representing a corporation in a suit against a former officer where the firms had also previously represented the officer in matters relating to the substance of the suit. The court declined, however, to enjoin the disqualified law firms from making available to substitute counsel information regarding the suit obtained from the defendant-officer. The rationale given was that there was no attorney-client privilege available to the defendant since the defendant was required to give prior counsel the requested information as part of his duties as an officer of the plaintiff corporation. Hutton seems to be distinguishable since the information sought in that case was apparently factual rather than the legal interpretation of facts sought by the defendants in the present action. However, to the extent Hutton might be indistinguishable from the present case, we decline to follow its conclusion. Rather, we agree with the court below that allowing the defendants to have access to the legal work of disqualified counsel negates the effect of the disqualification order. See Cord v. Smith, 338 F.2d 516, 521, 525 (9th Cir. 1964).
 
 
 29
 Defendants' final argument is that the injury to defendants and the delay of the main suit caused by denying substitute counsel access to the Foley & Lardner work product far outweigh the benefits derived by the protection of the plaintiff and the integrity of the judicial system. To the extent the competing interests are to be weighed, we cannot say the balance was improperly struck in this case. The right to avoid paying twice for the same legal work cannot be said, in this case, to outweigh the policies of protecting public confidence in the legal profession and the individual attorney-client relationship. Nor do we feel that any delay caused by the necessary duplication of work is sufficient to overturn the result. It is within the power of the district court to control the proceedings below in order to avoid unnecessary prejudice to defendants while expediting a final resolution.
 
 
 30
 Correspondingly, defendants' argument that denial of access to the questioned work product improperly applies ethical standards to the litigant instead of the lawyer is misplaced. The reason for refusing to allow the use of predisqualification work product is not to injure the defendants but to protect the plaintiff specifically and the public generally. Nor is the defendants' contention that plaintiff caused Foley & Lardner to generate the work product by its predisqualification interrogatories compelling in light of the strong public interest in preserving client confidences and the integrity of the litigation process. See Emle Industries, Inc. v. Patentex, Inc., supra note 13, at 574 (laches defense inapplicable to disqualification motion).[15]
 
 
 31
 Therefore, since prior counsel had been disqualified ab initio, substitute counsel should not be allowed to make use of the legal memoranda and loan file analyses which never should have been prepared. We are not unmindful of the difficulties presented by the ethical ban on opposing a former client in light of today's complex relationships in law and business. Consequently, we do not express any opinion on questions involving matters beyond the facts of this case. However, the maintenance of confidence in our judicial system requires that ethical standards be meticulously observed and, thus, we cannot say that the district court exceeded the bounds of its discretion in denying defendants' motion for access to prior counsel's work product.[16]
 
 IV.
 
 32
 For the reasons stated above, the order of the district court is affirmed.
 
 
 33
 AFFIRMED.
 
 
 34
 PELL, Circuit Judge, concurring in part and dissenting in part.
 
 
 35
 I concur in Part II of the foregoing opinion holding that this court has jurisdiction to entertain the appeal and denying plaintiff's motion to dismiss.
 
 
 36
 Although I am unable to disagree with the well-written exposition of ethical principles in Part III of the opinion, I am unable to agree with the result reached in that part of the opinion and respectfully dissent.
 
 
 37
 There is no reason for thinking that Shakespeare was advancing a novel thought when one of his characters placed as a first priority that of killing all the lawyers. While this would seem to be visiting the ultimate penalty on the members of the profession, the January, 1978, issue of the American Bar Association Journal which came to my desk as this dissent was being prepared stated (at p. 35) that many observers feel that society is getting more cynical about lawyers and other professionals, and that a pollster says lawyers have a bad image.
 
 
 38
 While this cynicism and poor image is not probably universally shared and certainly ignores the public service performed by lawyers in all governmental aspects as well as the gratitude of people whose entanglement in legal difficulties has been obviated by those in the profession, nevertheless, those of us of the bench and bar must be constantly aware of what is a frequent attitude and affirmatively endeavor to eliminate those factors which have justifiably caused the status of disrepute. Indeed, we of the bench would be remiss in our obligation to the public if we were to approve conduct diluting a requirement of adherence to the highest ethical standards. Nevertheless, we should also be aware of the fact that frequently in the quest for the attainment of a goal for human conduct, zealousness, unmodified by objective evaluation, can cause the pendulum to swing too far, a result which I think has occurred in the present case, by both the district court and the majority of this court adopting what amounts to a per se rule.
 
 
 39
 * Turning to some particular aspects of the majority opinion, I note the following:(1) The majority opinion refers to the policy encouraging full and frank discussion between an attorney and his client which requires that the client have complete faith that his legitimate secrets will never be used against him. No one can quarrel with this as a principle. I fail, however, to discern its applicability in the present case. The defendants' motion explicitly specified that the subject work product did not contain or reflect any confidential information obtained from the Trust. Instead it appears quite clear that what was involved here was a routine, tedious analysis of loan files relating to some 300 complex transactions. This work would appear to be of a type which any competent lawyer by spending the substantial time which would be required could accomplish just as well as did Foley & Lardner. The defendants are merely attempting to avoid what appears to me to be totally unnecessary duplicative work. The only apparent advantage I have been able to see that will accrue to the plaintiff is that of harassment of an opponent in litigation, a purpose scarcely qualifying for a judicial imprimatur.
 
 
 40
 (2) The majority opinion proceeds, however, notwithstanding that there is no apparent basis in the record for invoking the protective cloak of confidentiality, or perhaps because of that lack, to state that it is unnecessary to establish that the disqualified lawyer actually possessed confidential information of the former client, such possession being presumed. Again this seems to me to miss the issue because we do not have a situation involving the transfer of confidential information but only post-relationship lawyer analysis and summaries of loan files, which work was of such monumental proportions that Foley & Lardner had a team of 15 lawyers assigned thereto for more than a year prior to that firm's disqualification. Because the present defense attorneys can, at a great loss of time and money, duplicate this work, the net result will be only that the plaintiff has a gamesmanship head start in the litigation. Of even more significance, however, in my mind, to the "presumed" portion of the majority opinion is that quite obviously an irrebuttable presumption has been created, or a per se rule, that whenever cause of disqualification exists any lawyer work thereafter is lost work irrespective of its nature or any other pertinent factors. Irrebuttable presumptions by their very nature are arbitrary and unreasonable and the denial of a fair opportunity of rebuttal is generally violative of principles of due process. Vlandis v. Kline, 412 U.S. 441, 446, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973); Cleveland Board of Education v. LaFleur, 414 U.S. 632, 644-45, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974). I see no more reason for conclusively presuming that the work product here involved should not be used because it involved confidential material than to presume conclusively that a pregnant teacher after the sixth month is incapable of teaching. If confidentiality is involved in this case as a predicate for decision, and I have difficulty reading the majority opinion otherwise, then it is because confidentiality has been presumed, which presumption the defendants effectively have rebutted on the record before us.
 
 
 41
 (3) The majority opinion, by way of flat statement, says that Foley & Lardner's analyses and legal memoranda concerning the subject loan files are too closely connected with disqualified counsel to be considered unobjectionable. Of course, the close connection exists, Foley & Lardner lawyers did the work, but I am unable to tell how the majority progressed from that obvious fact to the conclusion that the work product is objectionable. Even if we should separate analyses from legal memoranda on the basis that the latter somehow involved more judgmental or tactical factors I have yet to have it demonstrated in this case that either the analyses or the legal memoranda are not capable of being reproduced substantially as Foley & Lardner did by the new counsel doing the same extensive lawyer work.
 
 
 42
 (4) The majority opinion notes that the use of pleadings, interrogatories, answers to interrogatories, and other pretrial documents prepared by Foley & Lardner is not contested. It would appear if the work of that law firm in one respect is tainted that the infection should not stop short of including all materials. The striking of the pleadings and similar materials, and having the parties start the litigation all over again, would, of course, lessen the gamesmanship head start that the plaintiff has presently achieved.*
 
 
 43
 (5) The majority opinion, quite understandably, has difficulty in distinguishing E. F. Hutton & Company, Inc. v. Brown, 305 F.Supp. 371 (S.D.Tex.1969), and therefore falls back upon a flat refusal to follow the Hutton conclusion. That case, of course, as the defendants concede, is not squarely in point. It is significant, however, in that the court there did analyze the factual aspects of the work involved, rather than resting on any type of an irrebuttable presumption, and this significance is strengthened in view of the fact that in Hutton a claim was made that the disqualified attorneys' files contained privileged information, while the plaintiff here does not assert that Foley & Lardner's work product has any information protected by the attorney-client privilege.
 
 
 44
 (6) The majority opinion implicitly appears to have some concern about the gamesmanship aspects here involved, referring to the defendants' contention that plaintiff caused Foley & Lardner to generate the work product by its predisqualification interrogatories, but quells any doubts by finding the issue not dispositive of this case in the light of the strong public interest in preserving client confidences and the integrity of the litigation process. Considering those aspects separately it has already been observed in this dissent that the confidentiality aspect really is nothing more than a straw man which should be appropriately eliminated. The integrity of the judicial process is, of course, another matter and I recognize that an argument to the effect that the slate should be wiped clean might have some prima facie appeal, particularly in egregious situations such as the use of confidential information in work performed during the disqualified period, the knowledgeable participation of the client, or other unconscionable conduct, none of which apparently exists here. Here it is the client who will suffer by additional cost for having the identical work done twice, and the litigation will also suffer by virtue of the inherent delays in that same process. Also, the slate, in any event, is not being wiped clean because the plaintiff is willing to let pleadings, answers to interrogatories and similar materials go unchallenged. Finally, if we are to speak of integrity of the litigation process, it would seem that it would be most appropriate to find dispositive significance in the delay in moving to disqualify Foley & Lardner until after the completion of certain discovery aspects of plaintiff's trial preparation.
 
 II
 
 45
 Perhaps an initial difficulty was interjected into the present issue by the use of the term "work product" by the defendants in their motion. The landmark case on the subject, of course, is Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), which refers to the generic tag of work product as being apt though rough. Id. at 511, 67 S.Ct. 385. However imprecise the term may have been, Hickman spawned a multitude of cases and extra-judicial writing. See the 74-page summary in Annotation, Development, since Hickman v. Taylor, of Attorney's "Work Product" Doctrine, 35 A.L.R.3d 412 (1971).
 
 
 46
 There probably is little question that what Foley & Lardner produced by way of analysis would fall within the definition by most courts of "work product," although in view of the underlying premise of federal discovery procedures of eliminating the sporting element of a trial, i. e., surprise, I find myself in agreement with the limited scope laid down by Judge Campbell for that very reason in Richards-Wilcox Manufacturing Company v. Young Spring & Wire Corp., 34 F.R.D. 212, 213 (N.D.Ill.1964):
 
 
 47
 (A)n attorney's work product can generally be defined to encompass writings, statements or testimony which would substantially reflect or invade an attorney's legal impressions or legal theories as to a pending or reasonably anticipated litigation.
 
 
 48
 Assuming, in any event, that the Foley & Lardner work, having been performed in preparation for trial, constituted "work product" as that term is generally defined, we nevertheless have an entirely different context in the present case than is involved in the numerous cases dealing with the subject, which are concerned with the extent to which material in the attorney's file is discoverable by his or her opponent. Hickman makes it clear that the protection given to the work product is not because of the attorney-client privilege, 329 U.S. at 508, 67 S.Ct. 385, but the rationale rather is "the general policy against invading the privacy of an attorney's course of preparation." Id. at 512, 67 S.Ct. at 394. Indeed, it has been stated that to the extent the work product doctrine is a privilege it is the privilege of the attorney and not that of the client. 35 A.L.R.3d at 423. Even though there is a close relationship between the work product doctrine and the attorney-client privilege, id., here the work was not performed for the plaintiff and rather obviously the defendants are imposing no objection to the use of the material. Further, Foley & Lardner are not objecting.
 
 
 49
 What I am saying at this point is not that the principles developed in the work product discovery cases should be considered but rather that they should not be. Nevertheless I am not able to discount that the result reached by the majority may have been influenced by the large body of law that holds work product to be sacrosanct in the discovery situation. The reasoning and result of the discovery cases are clearly not applicable here.
 
 
 50
 While, as is quite apparent from this dissent, I would have held that the present defense counsel should have been permitted to receive the work product generated by Foley & Lardner, I have, in accordance with the record presented to us, gone on the assumption that that work product contains no information derived from a former confidential relationship between Foley & Lardner and the plaintiff and, further, is basically of the type of documentation which the successor lawyers can themselves produce. I would assume that both Foley & Lardner and the successors would not give or receive any other type of material. This assumption appears to me to be entirely warranted. If we assumed anything else this entire aspect of the litigation is an exercise in futility because if the attorneys involved contemplated transferring any improper information there would have been little point in seeking court authority in the first place. Those not willing to have honored ethical precepts could have initially resorted to clandestine oral conferences.
 
 
 51
 Finally, I note that the motion also asked, in addition to the actual work product, for an explanation of said work. I would, while granting the motion, curtail its grant to the limited extent reasonably necessary to the transfer of the work to the new counsel. See Hutton, supra, 305 F.Supp. at 377. I understand the defendants are seeking nothing more than an explanation of what work has been done to the point of new counsel's takeover.
 
 
 
 *
 The Honorable Wilson Cowen, Senior Judge of the United States Court of Claims, is sitting by designation
 
 
 [1]
 "The courts of appeal shall have jurisdiction of appeals from all final decisions of the district courts of the United States . . . ."
 
 
 [2]
 We do not perceive plaintiff's third argument to be addressed specifically to the invocation of the Cohen rule but rather a question of general procedure. See text accompanying note 4 infra
 
 
 [3]
 In Cohen, the Supreme Court held that it had jurisdiction to hear an appeal from an order requiring the plaintiff to give security for defendant's expenses before proceeding with the litigation:
 This decision appears to fall in that small class which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated. The Court has long given this provision of the statute this practical rather than a technical construction. Bank of Columbia v. Sweeney, 1 Pet. 567, 569, (7 L.Ed. 265); United States v. River Rouge Co., 269 U.S. 411, 414, (46 S.Ct. 144, 70 L.Ed. 339,) Cobbledick v. United States, 309 U.S. 323, 328, (60 S.Ct. 540, 542, 84 L.Ed. 783).
 We hold this order appealable because it is a final disposition of a claimed right which is not an ingredient of the cause of action and does not require consideration with it.
 337 U.S. at 546-47, 69 S.Ct. at 1225-26.
 
 
 [4]
 Plaintiff's citation of Securities and Exchange Commission v. Investment Corp. of America, 369 F.2d 383 (7th Cir. 1966) does not support the general proposition that an order construing an appealable order is itself not appealable. That case involved an application of 28 U.S.C. § 1292(a)(1) which is a specific statutory exception to the final judgment rule where injunctions or their modification are involved. That situation is not presently before this court and it is sufficiently narrow to preclude us from interpreting the Investment Corp. holding as stating a general procedural rule
 
 
 [5]
 The district court's order of September 15, 1977 denying defendants' request to certify the work product order for appeal under 28 U.S.C. § 1292(b) also noted defendants' failure to follow either the appeal or clarification route
 
 
 [6]
 Plaintiff maintains that defendants did bring the work product question before the court in their arguments on the disqualification motion and thus the district court ruled upon the question sub silentio. It is true that, in their brief in opposition to plaintiff's disqualification motion, defendants argued that an unnecessary waste of legal effort would occur if prior counsel were disqualified. (R 7:36-37.) However, it is unclear whether defendants were actually referring to the work product they now seek or whether they were concerned with the general delay and duplication that would result from new counsel having to become familiar with the case. A more direct reference was made to the analysis of the loan files in a December 18, 1975 letter from Foley & Lardner to the district court. However, that too is susceptible to varying interpretations. (R 36:2.) In any event, no mention of the predisqualification work of Foley & Lardner was made in the disqualification order and we do not assume the issue was resolved therein
 
 
 [7]
 This delay is understandable since the suit presented presumably complex securities law questions and care in the selection of substitute counsel, and in substitute counsel's own decision to accept the case, was to be expected
 
 
 [8]
 Cf. Gillespie v. U. S. Steel Corp., 379 U.S. 148, 154, 85 S.Ct. 308, 312, 13 L.Ed.2d 199 (1964): "in light of the circumstances we believe that the Court of Appeals properly implemented the same policy Congress sought to promote in § 1292(b) by treating this obviously marginal case as final and appealable under 28 U.S.C. § 1291 (1958 ed.)."
 
 
 [9]
 There is apparently no dispute that defendants seek the "work product" of prior counsel as that term is commonly used. That is, defendants seek
 . . . the information (prior counsel) has assembled and the mental impressions, the legal theories and strategies that he has pursued or adopted as derived from interviews, statements, memoranda, correspondence, briefs, legal and factual research, mental impressions, personal beliefs, and other tangible or intangible means.
 State ex rel. Dudek v. Circuit Court, 34 Wis.2d 559, 589, 150 N.W.2d 387, 404 (1967); Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947).
 
 
 [10]
 74 F.R.D. at 627. We agree with the district court's characterization of the problem: resolution of the work product question is dependent upon interpreting the effect of the disqualification order. However, we do not believe this jeopardizes our conclusion regarding the jurisdictional issue. Basing the current determination on an interpretation of the effect of a prior order is not the same as saying that the present question was already decided in the prior order. See text accompanying note 6 supra
 
 
 [11]
 The Code of Professional Responsibility has been adopted by the Wisconsin Supreme Court. Wis.Stats.Ann. ch. 256, State Bar Rule 9 (West) (1971)
 
 
 [12]
 Without citing Canons 4 and 9, the district court in the present case followed their guidelines in determining that the sanctity of a former attorney-client relationship and public confidence in the judicial system would be threatened if the use of predisqualification work product by substitute counsel were permitted. 74 F.R.D. at 627
 
 
 [13]
 Judicial enforcement of this strict ethical standard is necessary to protect the confidential attorney-client relationship:
 A lawyer's good faith, although essential in all his professional activity, is, nevertheless, an inadequate safeguard when standing alone. Even the most rigorous self-discipline might not prevent a lawyer from unconsciously using or manipulating a confidence acquired in the earlier representation and transforming it into a telling advantage in the subsequent litigation. Or, out of an excess of good faith, a lawyer might tend too far in the opposite direction, refraining from seizing a legitimate opportunity for fear that such a tactic might give rise to an appearance of impropriety. In neither event would the litigant's or the public's interest be well served. The dynamics of litigation are far too subtle, the attorney's role in that process is far too critical, and the public's interest in the outcome is far too great to leave room for even the slightest doubt concerning the ethical propriety of a lawyer's representation in a given case. These considerations require application of a strict prophylactic rule to prevent any possibility, however slight, that confidential information acquired from a client during a previous relationship may subsequently be used to the client's disadvantage.
 Emle Industries, Inc. v. Patentex, Inc., 478 F.2d 562, 571 (2d Cir. 1973).
 
 
 [14]
 The use of pleadings, interrogatories, answers to interrogatories, and other pretrial documents prepared by Foley & Lardner is not contested in this case
 As a corollary, defendants argue that there is no clear date at which the retroactive effects of a disqualification order are to begin. Defendants suggest that the choice of any one of several dates could be supported under the district court's retroactive theory of disqualification: the date Foley & Lardner began to represent both Trust and defendants; the date Trust hired special counsel; the date Trust refused to give permission to Foley & Lardner's continued representation of defendants; the date the suit was filed; or the date Trust filed its motion for disqualification of prior counsel. Given the work product that defendants seek, we are not required here to arbitrarily set any of the dates suggested as a precise guideline for future cases. The question is subjective not objective. The extent of retroactivity varies according to the materials sought. Here, Foley & Lardner's written analyses of the subject loan transactions and an oral explanation thereof are so closely connected to Foley & Lardner's representation that they would be objectionable regardless of when the work was performed.
 
 
 [15]
 There is some dispute as to whether plaintiff actually caused defendants' injuries to be increased by making discovery requests before moving to disqualify Foley & Lardner. At oral argument, plaintiff's counsel explained the delay in seeking disqualification as being due to a desire to allow Foley & Lardner to withdraw voluntarily. While we do not approve of any tactic which intentionally increases the litigation costs of a party for improper reasons, we do not find the issue dispositive of this case
 
 
 [16]
 There is no evidence, and we do not suggest, that defendants' prior counsel were guilty of deliberate improprieties
 
 
 *
 I note also the possibility that a gamesmanship advantage somewhat different from that I have described will result from the majority's decision here. Plaintiff's counsel has offered to waive objections to defendants' use of the work product in question if plaintiff, which could not have discovered the material, is also allowed to use it. The untenable choice created by the majority for defendants between incurring huge costs for totally duplicative legal work or accepting this offer could, then, produce a windfall to plaintiff of a legal analysis which it, of course, can duplicate, just as new counsel for defendants can, but only with a considerable expenditure of time and effort