584 F.2d 201
 FIRST WISCONSIN MORTGAGE TRUST, a Massachusetts Business
Trust, Plaintiff- Appellee,
v.
FIRST WISCONSIN CORPORATION, a Wisconsin Corporation, First
Wisconsin Mortgage Company, a Wisconsin Corporation, and
First Wisconsin National Bank of Milwaukee, a National
Banking Association, Defendants-Appellants.
 No. 77-1786.
 United States Court of Appeals,
Seventh Circuit.
 Reheard En Banc June 7, 1978.
Decided Sept. 22, 1978.
 
 H. Templeton Brown, Mayer, Brown & Platt, Chicago, Ill., for defendants-appellants.
 Bernard J. Nussbaum, Chicago, Ill., for plaintiff-appellee.
 Before FAIRCHILD, Chief Judge, CASTLE, Senior Circuit Judge, and SWYGERT, CUMMINGS, PELL, SPRECHER, TONE, BAUER and WOOD, Circuit Judges.
 PELL, Circuit Judge.
 
 
 1
 The ultimate, and apparently first impression, issue in this appeal, stated as simply as possible is whether, when attorneys are judicially determined to have been disqualified to represent a client because of prior simultaneous representation of that client's adversary in litigation, the written product of lawyer work[1] performed during the period of disqualification may be made available to successor counsel. The answer to this issue, in our opinion, is not a per se preclusion but must be a flexible one based upon an examination of the particular facts of the case under consideration.
 
 I.
 
 2
 The plaintiff, First Wisconsin Mortgage Trust (Trust), is a real estate investment trust which was established in 1971 under the sponsorship of the defendant First Wisconsin Corporation (FWC) with a public offering following. Trust was advised on its investments by the defendant First Wisconsin Mortgage Company (Advisor), a wholly owned subsidiary of FWC. Advisor was staffed by employees of the mortgage loan division of the defendant First Wisconsin National Bank (Bank), also a subsidiary of FWC. FWC was jointly involved in various loan transactions with Bank. We ordinarily herein will refer collectively to FWC and its subsidiaries as "defendants."
 
 
 3
 From the time Trust was established the law firm of Foley & Lardner (Foley) was general counsel to Trust as well as general counsel to FWC and its subsidiaries.
 
 
 4
 Commencing in 1973 serious loan defaults occurred, a problem which increased in momentum in 1974. Apparently Foley began to represent Trust and Bank in the workout of some of the problem loans, but in early 1974 Foley recommended that Trust retain separate counsel to represent it in connection with the problem loans. At that time Trust retained Sonnenschein, Carlin, Nath & Rosenthal (Sonnenschein) as special counsel to represent the Trust with regard to the problem loans. Following retention of Sonnenschein, Trust asserted claims against the defendants, and threatened to file suit thereon. Adversary negotiations followed between the Trust represented by Sonnenschein and defendants represented by Foley. At one point in June 1974 a partial agreement was executed but it apparently did not resolve the underlying disputes. In September 1974 Foley resigned as general counsel to Trust. Indications of the filing of suit by Trust and negotiations between Foley and Sonnenschein to resolve the controversy continued through the winter months of 1974-75. These were not met by success and the present suit was filed in March 1975 with Trust claiming that the defendants violated certain sections of the Federal Securities Laws and Regulations.
 
 
 5
 Throughout most of 1974 and early 1975, 15 Foley lawyers engaged in an extensive analysis and review of some 300 real estate investment transactions, this being the work product which is the subject matter of the present dispute. There is no indication of any formal objection during the pre-suit adversary negotiations on the part of Trust or its counsel as to Foley representing the defendants. However, immediately following the filing of the suit, Foley, by letter, requested the consent of Trust to its representation of the defendants, which consent was refused by Trust. In June 1975 Sonnenschein advised Foley that if that firm did not withdraw voluntarily, Trust would move its disqualification which in fact was done on August 1, 1975. Defendants opposed the motion on the principal ground that the work done by Foley for Trust did not substantially relate to the issues in the lawsuit. The motion for disqualification was granted on November 16, 1976. First Wisconsin Mortgage Trust v. First Wisconsin Corp., 422 F.Supp. 493 (E.D.Wis.1976).
 
 
 6
 On December 15, 1976, Foley withdrew and Mayer, Brown & Platt (Mayer) entered that firm's appearance for the defendants in this action. On the same day the successor counsel filed a notice of appeal of the disqualification order. On January 7, 1977 Mayer requested the district court to hold a pre-trial conference to discuss defendants' access to the work product as generated by Foley prior to disqualification. The district court declined to hold a conference on the basis that it had been deprived of jurisdiction upon the filing of the notice of appeal. The defendants thereupon moved for voluntary dismissal of the appeal of the disqualification order and entered into negotiations regarding the work product with the plaintiff.
 
 
 7
 Shortly thereafter defendants formally moved the district court for authorization to request access to the Foley work product. This motion was denied on June 14, 1977. First Wisconsin Mortgage Trust v. First Wisconsin Corp., 74 F.R.D. 625 (E.D.Wis.1977). The defendants filed a timely notice of appeal of the work product order and also requested the district court to certify the order for interlocutory appeal under 28 U.S.C. § 1292(b), which certification request was denied on September 15, 1977, subsequent to the filing of the defendants-appellants' original brief in this court. Plaintiffs' August 17, 1977, motion to dismiss the appeal for lack of jurisdiction was taken under advisement by the court together with the merits at oral argument. By a 2-1 decision this court affirmed the district court order on February 24, 1978. First Wisconsin Mortgage Trust v. First Wisconsin Corp., 571 F.2d 390 (7th Cir. 1978). Subsequently upon the granting of the petition to that effect, the case was reheard by the court en banc.
 
 II.
 
 8
 In the opinion of the three-judge panel originally hearing this case, the first issue considered was the plaintiffs' motion to dismiss the appeal for lack of jurisdiction. The entire panel was of the opinion that the appeal was properly before this court. No purpose is served by restating the previous opinion of the court on the matter of jurisdiction. That portion of the prior opinion is therefore adopted as the opinion of the court sitting en banc and part II of the court's prior opinion, 571 F.2d at 392-96, is incorporated herein by reference.
 
 III.
 
 9
 Turning to the merits of this appeal, we do so with the underlying assumption that the disqualification of Foley was correct, the appeal having been dismissed.[2]
 
 
 10
 That which the defendants seek to secure from the attorneys formerly representing them in the present litigation is, as described by the defendants, the "written work product, consisting essentially of summaries of loan files relating to more than 300 complex transactions, and an explanation limited to an identification of the documents reviewed."
 
 
 11
 Beginning in 1974 a number of Foley attorneys were engaged in analyzing the various claims being asserted on behalf of Trust and analyzing the loan files regarding such claims. This work continued after suit was filed. The analysis of the loan files was conducted by a team of 15 Foley lawyers for more than a year prior to the ultimate disqualification of that firm in November 1976.
 
 
 12
 Neither the district court in its opinion, nor the plaintiff in its brief or at oral argument has contradicted the defendants' contention that the loan file summaries are the result of routine lawyer work of a type which any competent lawyer, by spending the substantial time which would be required, could accomplish just as well as did Foley. The work product came into being for the benefit of the defendants. It may be safely assumed that the work was not performed gratuitously by Foley but rather on a compensated fee basis. There is no challenge to the defendants' assertion that the preparation of the loan file summaries was not aided by any confidential information acquired by the Foley lawyers through their prior relationship with Trust. Indeed, it appears that the summaries are no different than they would have been if made in their entirety by lawyers who were strangers to all of the parties.
 
 
 13
 The district court in its opinion under review here, while noting the contention that no confidential information was involved, in effect found this to be of no significance. Quoting from the case of E. F. Hutton & Company v. Brown, 305 F.Supp. 371 (S.D.Texas 1969), a case in which the lack of confidentiality was proposed as a defense to disqualification, the district court in the present case, in what we can characterize only as adopting a per se standard, stated that "(i)f any attorney's subsequent adverse representation in the form of his work product is not barred from use by substitute counsel, then there is little or no point in the initial disqualification." 74 F.R.D. at 627. The district court, addressing itself to that part of Hutton which denied an injunction against the disqualified counsel turning over its files to substitute counsel, distinguished Hutton on the basis that the requested injunction against the production of files appeared to have been based on an asserted attorney-client privilege. We shall discuss Hutton further hereinafter but at the moment note only that the district court in the present case stated that the plaintiff before it did not oppose the turnover motion on the grounds of attorney-client privilege which had been true in Hutton. There the court had found the attorney-client privilege was inapplicable to the facts of the case. The district court in the present case then observed that here the plaintiff was objecting to the turnover on the grounds that the Foley firm had been disqualified ab initio with which the court agreed. 74 F.R.D. at 628.
 
 
 14
 As we read the district court's opinion in this respect, it is saying that because the Foley firm was disqualified from the time litigation was instituted, and in all probability from the very beginning of its representation of the defendants on the matter which ultimately went into litigation, any work performed during this entire period is automatically tainted by the disqualification and is unavailable to the party for whom the work was performed. This, of course, constitutes a sanction for representation subsequently determined to be improper without any independent basis therefor related to the work itself.
 
 
 15
 In our opinion, such an automatic or per se equation of denial of the work product to the disqualification of representation is not good law and the application of such a rule without more requires reversal. No doubt it will frequently be that the lawyer who is unfortunate enough to become involved in the Goodwin Sands of simultaneously representing clients whose interests either are or thereafter come into conflict, and who ceases representation of one of the clients, will find that the work performed during the period subject to disqualification will have aspects of confidentiality or other unfair detriment to the former client arising from the very fact of the knowledge and acquaintanceship acquired during the period of the prior representation. This does not mean, however, that this is always the situation, or even that it is frequently so. We see no reason for an irrebuttable presumption merely from dual representation in the conflict context to the effect that whenever cause of disqualification exists any lawyer work thereafter is lost work irrespective of its nature or any other pertinent factors.
 
 
 16
 The present case presents a particularly strong case for justifying a flexible rule in that the order of disqualification did not occur until 15 months after the motion for that purpose. The practical effect of this time frame is that once a motion of disqualification is filed the work performed thereafter is subject to the risk of automatically being wasted work to the detriment of the client. A very difficult choice would have to be made as to whether work should be continued by the challenged counsel. Certainly this is a real penalty for the client who is satisfied with the representation it is receiving but who finds out a year or so later that all the work which has been done in its behalf and for which it has paid has to be redone. Even though the attorneys who are claimed to be disqualified anticipate success in resisting the motion to disqualify, nevertheless they are laboring under a continuing handicap during all the time that the motion is pending. The judge to whom a motion for disqualification is presented, in evaluating whether the work product should be denied to the client on whose behalf it is done, will certainly consider factors which indicate the propriety of denial such as the use of confidential information or other unfair detriment to the other side. Conceivably also if the basis for the disqualification is so obvious that no good faith justification could be advanced for it, weight should be given to the fact that attorneys persisted in performing work when it was patent that their professional responsibility mandated their complete withdrawal. From the record of the case before us we do not deem that was the situation here. Attorneys who reasonably and in good faith resist the challenge of disqualification, and who perform work during the interim period in which the correctness of the disqualification motion is being determined, which work derives no advantage from the fact of prior representation, should not in effect be enjoined from that work by the mere filing of the motion. Unfortunately the practical effect might well be to impose a moratorium upon trial preparation for such period of time as it might take to rule upon a motion for disqualification.
 
 
 17
 A secondary aspect of this matter is that litigation must be ongoing, and the counsel representing the party prior to an ultimate disqualification is confronted with other aspects of the litigation as it proceeds, such as filing responsive pleadings, answering interrogatories, addressing requests for admissions, and production of documents, and in taking part in depositions. In the present case, all of these procedures, other than the work product, which were performed by Foley on behalf of the defendants have been left extant without challenge by Trust.
 
 
 18
 This is not a matter of penalty against the lawyer. The lawyer's penalty is the disqualification. The penalty from not having the work product made available to substitute counsel is against the client. The rule as here laid down by the district court would destroy the work done by disqualified counsel irrespective of any fault on the part of the party litigant.
 
 
 19
 In Part II of the original panel's opinion which we have adopted as the opinion of this court it was noted that increasing business and legal complexities as well as heightened sensitivity to ethical standards potentially will result in more disqualifications of counsel and presumably more questions regarding the status of pre-disqualification work and that the issue therefore was an important question of law. We agree thoroughly and particularly emphasize that we would not willingly approve any rule which would in fact or would even seem to lessen adherence to high ethical standards both on the part of counsel and in the general administration of justice. We do not believe that the result we reach in the present case will have that effect.
 
 
 20
 While paying tribute to the necessity of adherence to the highest ethical standards, we must also recognize that historically, partially, at least, because of the very nature of the adversary heat engendered in litigation, the image of lawyers in the public mind has not been optimal. To counteract this all-too-prevalent attitude, standards of professional conduct have increasingly been adopted, directed not only at those matters which actually offended the broad, and sometimes vague, ethical concepts of earlier years, but also at those which gave the appearance of offense. Specificity more and more has entered the picture and conduct which might not have been regarded as beyond the pale of acceptability a generation ago is now the subject of censure.[3]
 
 
 21
 With this background in mind, we deem it appropriate to observe that in our opinion a lawyer who is charged with impropriety, here a disqualifying conflict of interest, should not, if he or she reasonably and in good conscience denies the charge, be expected forthwith to withdraw from the representation. Indeed, proper representation of the client might seem to militate against such precipitous action, suggesting instead a vigorous resistance where in good faith it is believed that impropriety does not exist. Leveling the charge of impropriety at opposing counsel, which if sustained would require withdrawal, should not be a standard part of counsel's offensive armament to be used routinely or without reasonable and good faith belief in its necessity. In the present case, we must also observe that we have no basis for discerning lack of good faith on the part of either charging or resisting counsel.
 
 
 22
 As was indicated at the beginning of this opinion, the particular issue for decision appears to be one of first impression. Nevertheless, the parties cite cases which appear to have some tangential bearing on the issue. Both parties, and, indeed, the district court, rely upon Hutton, supra, although the principal value of the extended opinion in that case appears from the plaintiff's perspective to be on the matter of disqualification. In that case, the court disqualified certain law firms from representing a corporation against one of its former officers where the attorneys had also previously represented the officer in matters relating to the substance of the suit. The court emphasized "that the receipt of confidential information is not a prerequisite to disqualification." 305 F.Supp. at 395. Nevertheless, the court denied the request for an injunction to prevent the disqualified firms from making available to the corporation or its other counsel any part of their files which contained information about the involved loan transaction which had come from the officer. As we have indicated hereinbefore the district court in the present case distinguished Hutton on the work product issue. Not surprisingly Trust agrees that Hutton has no application here, but further places a logical gloss on that opinion, which we have some difficulty in following, to the effect that because New York counsel of Hutton, who were not of record, were also disqualified the purpose of disqualification would not be served if the work product of the disqualified lawyers were to be available to substitute counsel.[4]
 
 
 23
 On the other hand, the defendants, also not surprisingly, find support in Hutton, asserting that the district court's distinction strengthens, rather than weakens their case in that the movant in Hutton "asserted some basis (I. e., the purported confidentiality of the information) for his argument that the files in question should not be turned over to disqualified counsel's former client, while Plaintiff in his case asserts none."
 
 
 24
 Whatever may be the correct reading of Hutton, the fact remains that although the Hutton court gave extensive analytical treatment to the matter of disqualification, it had little difficulty in determining that the files which disqualified counsel had accumulated should be passed on to the new counsel. We also note that court's reference, in ruling on the matter of an interlocutory appeal pursuant to 28 U.S.C. § 1292(b), to the fact that if an appeal of the disqualification ruling was postponed until final judgment the question would be moot and Hutton would incur delay and expense "while new counsel are digesting the exhaustive files its present counsel have amassed." 305 F.Supp. at 402. We also discern an underlying rationale to the effect that the files which were being passed along were not acquired by virtue of any violation of confidentiality.
 
 
 25
 The parties also disagree on the proper reading of Allied Realty of St. Paul, Inc. v. Exchange National Bank of Chicago, 283 F.Supp. 464 (D.Minn.1968), Affirmed, 408 F.2d 1099 (8th Cir. 1969), Cert. denied sub nom. Abramson v. Exchange National Bank of Chicago, 396 U.S. 823, 90 S.Ct. 64, 24 L.Ed.2d 73. In this case the district court, while finding that a former government attorney was disqualified to serve in the particular litigation because of American Bar Association Canon 36, denied an injunction which would have prevented "using evidence, knowledge or information examined or obtained by (the former government lawyer) in connection with this and any other litigation." Trust correctly points out that the injunction was denied because there was no showing that there was any intention to use any documents, testimony, or information that had not become public. The defendants find some support nevertheless in the reasoning of the court in distinguishing between disqualification of counsel and access to that counsel's work product. We do note that the district court did observe that it did "not suppress or deem 'tainted' or 'immunized' any of plaintiff's intended proof at the trial Even though such may have been 'examined or obtained' by (the former government lawyer)." 283 F.Supp. at 470. (Emphasis supplied.) In the present case the raw materials which Foley had examined and analyzed were loan files which were equally available to the plaintiff for examination and analysis. The work product, the analyses, if "tainted" in the present case are only so by virtue of the application of a per se sanction flowing from the disqualification, and relating back in extent to the beginning of the cause for disqualification. They are not "tainted" by virtue of having been based upon confidential knowledge or other advantage gained during or from the dual representation.
 
 
 26
 Trust also cites Cord v. Smith, 338 F.2d 516 (9th Cir. 1964). We read this case as saying that the disqualified attorney, once disqualified, should not act by way of consultation or advice outside the court to the former client, a result of disqualification which would seem logically to follow and which would not seem to be arguable. We do not read the case, however, as going farther to say that work product which had been achieved during the period prior to the determination of disqualification necessarily is lost to client in whose behalf the work product was produced.
 
 
 27
 The most recent case coming to our attention, and one decided since the original opinion of this court, is International Business Machines Corporation v. Levin, 579 F.2d 271 (3d Cir. 1978). In that case, the court after noting the wide discretion of the district court in framing its sanctions applicable upon a disqualification order so as to be just and fair to all parties concerned, affirmed the disqualification order, concluding that the district court did not err in determining that IBM had not given informed consent to the dual representation, even though the law firm did not obtain any information which would aid it in the prosecution of an antitrust suit against IBM. The court then addressed itself to the work product issue:
 
 
 28
 It is true that the plaintiffs will be injured by the disqualification of CBM, their counsel for a number of years. Here the district court ameliorated the harsh effect upon the plaintiffs of its sanction against CBM by permitting the turnover to substitute counsel for the plaintiffs within sixty days of the past work product of CBM on the case. IBM contends that the allowance of a turnover of work product with consultation, particularly work product prepared after the filing of IBM's motion, was an abuse of discretion.
 
 
 29
 In support of its contention, IBM cites First Wisconsin Mortgage Trust v. First Wisconsin Corp., 571 F.2d 390 (7th Cir. 1978), and Fund of Funds, Ltd. v. Arthur Andersen & Co., 567 F.2d 225 (2d Cir. 1977). To the extent that the Seventh Circuit Court of Appeals lays down a legal tenet in First Wisconsin Mortgage Trust against permitting the turnover of a disqualified attorney's work product, we disagree, but we note that the court in that case expressly limited its holding to the facts of the case. 571 F.2d 390, 399.
 
 
 30
 579 F.2d at 283. The court then stated what we deem to be an important guiding principle in cases of the present type, namely, that "disqualification in circumstances such as these where specific injury to the moving party has not been shown is primarily justified as a vindication of the integrity of the bar." at 283. This again brings a differing focus to what we regard as disparate aspects of these cases: the disqualification, which when cause exists, although having some impact upon the client, is primarily a sanction against the lawyer, while the prohibition of the turnover of the work product, created during the period subsequently determined to be a time of violation, but which has derived no advantage from the dual representation, such as would result from the use of confidential information, causes the sanction to be imposed on the client not the lawyer.
 
 
 31
 The cases to which we have adverted while not squarely in point do clearly point the way, in our opinion, for separate analysis and treatment of the two aspects of the situation. On that basis and looking at the case before us, we decline to apply the principle which basically Trust urges that if there is disqualification there is per se taint denying the use of work product during the period of disqualification. To apply this inflexible rule would, it appears to us, substantially activate the undesirable results urged by the defendants in their petition for rehearing.
 
 
 32
 It would destroy the work done by disqualified counsel, irrespective of any fault on the part of the party for whom the work was done;
 
 
 33
 It would do this regardless of whether the work destroyed involved the use of any confidential information obtained from the complaining party;
 
 
 34
 It would foreclose trial courts from any exercise of discretion in determining what effect an order of disqualification should have upon the parties to litigation, for it creates a Per se rule whose effect is automatic, and unqualified once an order of disqualification is entered, regardless of the circumstances giving rise to the disqualification and regardless of the extent to which the complaining party may have caused the work in question to be done;
 
 
 35
 It would seriously impede the administration of justice, because the rationale of the decision applies to all work done by disqualified counsel, and for all practical purposes it would impose a moratorium upon trial preparation for such period of time as it might take to rule upon a motion for disqualification;
 
 
 36
 It would do a major injustice to the clients of disqualified counsel, causing them to pay a second time for the same work;
 
 
 37
 It would encourage the public in its dissatisfaction with the expense and delay involved in the administration of the judicial system;
 
 
 38
 It would provide no benefit to the complaining party other than the satisfaction of imposing an unnecessary financial burden on its opponent;
 
 
 39
 It would in no way discipline disqualified counsel whose actions have been the cause of the disqualification order.
 
 IV.
 
 40
 While we remain satisfied after reading the dissenting opinion of Judge Castle that the foregoing opinion speaks for itself and disposes correctly of the issue presented to the court, in view of the length and vigor of the dissenting opinion, we deem we should make the following observations regarding that opinion.
 
 
 41
 In spelling out what it regards as the "dangerous" and "nightmarish" results of the En banc decision in this case, the dissent refers to the "particularly egregious facts here." With respect, it appears that the dissent has strayed into some hypothetical factual situation which was not involved here as to the particular work product that substitute counsel seeks for the benefit of the defendants. If the reference to egregiousness refers to the fact that Foley at one time represented both Trust and the defendants, no one in this litigation has contended that dual representation with knowledge thereof by the clients is per se invalid. When it became evident that conflicting positions were developing between Trust and the defendants, it was Foley that recommended that Trust retain separate counsel. If the egregiousness is charged as arising out of the fact that Foley continued to do work for one of the clients after litigation developed, or after it became obvious that it would develop, Foley was faced with the alternative of withdrawing simply on the basis that the charge had been made or, if, in good faith, it thought the charge not justified, proceeding to represent its client in the ordinary manner that lawyers do. The dissent itself recognizes that "there is no indication that any deliberate improprieties have occurred." It would seem the characterization of egregiousness should be based upon the facts of the case in hand and not upon non-record suppositions.
 
 
 42
 Secondly, we note the several references to the majority opinion imposing a difficult, if not impossible, standard of determining whether " specific confidential information" was involved in the work product of any case. It would appear that the dissent has ignored the broader standard of discretion which we have suggested in future cases be applied on a case-by-case basis which would include the determination of whether there was any "taint of confidentiality or Other improper advantage gained from the dual representation." The movant who claims that its opponent should be denied the work product because of the opponent's counsel having previously also represented it should be in the best possible position to point out to the district court the facets of the relationship which it had had with the disqualified counsel which would somehow give an improper advantage against it. Certainly the movant should be aware of the confidence or secrets which it imparted to the counsel which might reflect on the current litigation. Such matters, of course, if protection thereof is needed, can be addressed to the court on an in camera basis.
 
 
 43
 In this respect indeed, we have no particular quarrel with the test proposed by the dissent that the cases would "turn upon whether there exists a reasonable possibility of confidential information being used in the formation of, or being passed to substitute counsel through, the work product in question." The dissent after stating this test then proceeds in part II. C., although first asserting that the possibility of Foley's using confidential information in its work on this case is "inescapable," to engage in speculation as to confidential information which "possibly," or as a "possibility," or even as "a distinct possibility," and finally as "highly probable," could have tainted the work product in question.
 
 
 44
 The difficulty here, however, is that this contention is made only in the dissenting opinion. Trust was in a position to know whether such possibilities existed, but the argument advanced by the concededly competent counsel now representing Trust contains no such contentions. The record in the case before us, and that is the only case we now need to decide, is devoid of any showing, either directly or by necessary implication, that the routine lawyer work bore the imprint of confidentially acquired or secret information.
 
 
 45
 We have relistened to the oral argument to the En banc court and note that counsel for the defendants flatly stated that
 
 
 46
 plaintiff has conceded both in its brief and on oral argument that no confidential information of any kind or character, directly or indirectly, has been used by counsel in connection with the work which has been done.
 
 
 47
 Counsel for Trust was asked from the bench if this was correct, to which he replied
 
 
 48
 that is a concession but it must be properly understood. There was no dispute in the court below between the parties that there not only was no confidential information but that there could be none. We have never conceded that Foley & Lardner did not have information which came to them from the trustees of the Trust. They were at every trustees' meeting.
 
 
 49
 The further question was put as to whether it was being contended that Foley & Lardner used confidential information they obtained from their clients in the preparation of the loan file analyses, to which the following reply was made:
 
 
 50
 No, your honor, it is contended, however, that it is likely that Foley & Lardner used information coming from both parties but not confidential information in the evidential sense.
 
 
 51
 Counsel conceded then that the loan files which had been analyzed were open to Trust as well as to its adversaries. At this point in the interest of putting this case into proper perspective, we emphasize once again that what we are concerned with are the routine summaries which the substitute firm can, if necessary, duplicate and which are of records equally available to both sides of the litigation.
 
 
 52
 Ultimately, counsel for Trust stated the real basis of its objection in the case before us as being that the "analysis on the work product issue has to be in pari materia with the analysis of the disqualification." Ultimately, therefore, the question before us is whether the two aspects necessarily control each other and we have held that such an inflexible result is not required.
 
 
 53
 Thirdly, we note that for 15 months the district court had the motion for disqualification under advisement, during which Trust counsel was aware that Foley was continuing to represent the defendants in the controversy including answering Trust interrogatories requiring analyses of loan files, Trust counsel never asked for any type of injunctive relief against Foley pending the ruling on the motion. Counsel were apparently content to rest on that which is their present position, i. e., that the challenged attorneys by virtue of the very fact of challenge should at the very least discontinue doing any work in the case. The fact remains that if Trust had been concerned about the work being done it was well within its power to ask for that work to be stopped by the court until it ruled on the disqualification motion which would have put into sharp focus whether the work was in any way tainted by the dual representation.
 
 
 54
 Finally, in view of what might be regarded as an implication in the dissenting opinion as to the view of this court on matters of professional ethics, we reiterate that we are in no disagreement with the absolute need for adherence to high professional standards of conduct including the need to avoid the appearance of impropriety; it very simply is our decision in the case before us that such adherence does not require any result other than the one we have reached.
 
 
 55
 Being of the opinion that the district court applied an incorrect rule of law in determining the present issue, we reverse the district court's order. Noting further, however, that in the particular case before us there has been no indication that any improper advantage has been secured, such as the use of confidential information, that the ruling of the district court would have been in any event an abuse of discretion, and that the underlying litigation has been already substantially delayed, we remand with direction to grant the motion of the defendants to turn over the work product in question to the substitute counsel.[5] The order shall include permission for the former counsel to make such explication of the work product to the substitute counsel as to effectuate reasonably the turnover.
 
 Reversed and Remanded.[6]
 
 56
 CASTLE, Senior Circuit Judge, with whom CUMMINGS and SPRECHER, Circuit Judges, join, concurring in part and dissenting in part.
 
 
 57
 I remain convinced that both the result and analysis of the majority panel opinion are correct. 571 F.2d 390. Since the En banc majority concurs in the panel's resolution of the jurisdictional issue, I will confine my remarks to the question of access to prior counsel's work product.
 
 I. Majority's Holding
 
 58
 The majority holds that it was an abuse of discretion for the district court to refuse to allow substitute counsel to have access to prior counsel's predisqualification work product without a finding that some specific confidential information exists therein. Accordingly, the majority opinion instructs the district courts in future cases to conduct an In camera inspection or other type of inquiry into the precise content of the predisqualification materials in order to determine if specific confidential information exists. (Maj. Op. at 204 and 211 n. 6.) For the present case, the majority assumes that no confidential information exists in Foley & Lardner's work product and orders the district court to turn over the materials to substitute counsel. I respectfully submit that, upon the record before us, the majority's assumption in the instant case is unwarranted and that its rule for future cases is both unworkable and a dangerous departure from long-accepted ethical guidelines.
 
 
 59
 The majority's outright reversal of the district court which orders immediate turnover of Foley & Lardner's work product to substitute counsel is unwarranted. Such a resolution does not even comport with the majority's own instructions to district courts in future cases to determine whether specific confidential information is contained in the questioned materials. The majority has apparently decided this case upon the bald assertion of defendants' substitute counsel that no confidential information was used. I have found nothing in the record to support that assertion.[1] Indeed, no one now involved in this case has ever seen the Foley & Lardner loan file analyses. It is disingenuous for defendants' substitute counsel to argue, and for the majority to assume, that no confidential information exists in, or was used to create, the materials in question. Only the Foley & Lardner firm knows precisely what is contained in the materials and even those members of the firm who did the analysis might not be conscious of the extent to which confidences obtained from plaintiff shaped the final product. See the discussion in Part II Infra.
 
 
 60
 In essence, the majority seems ready in this case to assume that there are no confidences contained in the work product unless shown otherwise. Failure to comprehend the limited nature of plaintiff's "concession" regarding confidential information has contributed to the creation of this false and improper issue. Plaintiff's counsel stated at the En banc oral argument that in a technical evidentiary sense there could be no information subject to an attorney-client privilege between parties represented by the same counsel. However interesting that observation might be as a footnote, this case involves the principles of legal ethics and not the law of evidence. To the extent evidentiary, procedural, or agency rules are generally instructive, we should accept their guidance. However, those rules should not strictly control the application of ethical principles. See Westinghouse Electric Corp. v. Kerr-McGee Corp., 580 F.2d 1311, 1316-1318 (7th Cir. 1978). As the ABA Code of Professional Responsibility (CPR) states,
 
 
 61
 The attorney-client privilege is more limited than the ethical obligation of a lawyer to guard the confidences and secrets of his client. This ethical precept, unlike the evidentiary privilege, exists without regard to the nature or source of information or the fact that others share the knowledge.
 
 
 62
 EC 4-4. Although not clearly expressed at oral argument, I understand plaintiff's position to be that, aside from the narrow evidentiary point, there are many confidences and secrets which existed in the fiduciary relationship between plaintiff and Foley & Lardner and that the court should prevent Foley & Lardner from possibly using those confidences and secrets to plaintiff's detriment.[2] The statements of plaintiff's counsel at En banc oral argument which are quoted by the majority in Part IV of its opinion fully support this understanding.
 
 
 63
 Nevertheless, even if the majority were to faithfully follow its holding that specific confidences or secrets must be shown to be present before access to the work product can be denied and remand this case for In camera inspection, such a resolution would be unworkable. The district judge would be called upon to determine if any of the documents in fact contain confidential information. In the present case, and presumably in most future cases, this undoubtedly would require a monumental commitment of judicial time as well as an additional expenditure of legal fees for all parties. Understandably, the majority can offer little guidance as to what the district courts should look for in such situations. Indeed the impossibility of establishing meaningful standards in this situation is obvious. Even the most superficially innocuous document or statement within a document may offer substitute counsel special insights into the plaintiff's internal structure or its litigation posture which would have been unavailable to anyone except plaintiff's prior counsel. CPR EC 4-5. See Part II C, Infra. Accordingly, plaintiff will have no assurance that its interest in preventing its confidences and secrets from being used against it has been preserved by the district court.
 
 
 64
 The majority's holding that the district court must inspect the documents in question before denying access to them also represents a dangerous departure from the generally accepted method of dealing with ethical questions which arise when a lawyer opposes a former client. As will be discussed in Part II, requiring a detailed inquiry into the specific confidences which might be possessed by prior counsel or used in his work product has long been considered improper. By attempting to draw fine ethical lines based upon the specific content of the objectionable material, the majority has adopted an approach to ethical enforcement which has been repeatedly condemned. See NCK Organization Ltd. v. Bregman, 542 F.2d 128, 132-33 (2d Cir. 1976); Cord v. Smith, 338 F.2d 516, 521, 524 (9th Cir. 1964). Remarkably, however, the majority further compounds its error by intimating that once the defendants have disclaimed the use of confidential information, the former client is the one who must point to the confidences used in the work. (Maj. Op. at 204) This is a direct reversal of the accepted burden of proof in such cases and severely limits the reach of Canon 4.
 
 
 65
 Therefore, it is my opinion that, upon the record, outright reversal of this case is improper even if one were to accept the majority's rule that specific confidences or secrets must be shown before access to predisqualification work product can be denied. However, it is also my belief that the theory underlying the majority's instructions that the district courts conduct In camera inspections to search for specific confidential information in future work product cases is also in error, and, consequently, remanding for further proceedings would also be improper. What follows then, is an explanation of why I feel that proper application of Canons 4 and 9 of the CPR to this record warrants affirmance.
 
 II. Canon 4
 
 66
 A. Application to Disqualification Situations.
 
 
 67
 The starting point for gauging the propriety of an attorney opposing a former client is Canon 4 of the ABA Code of Professional Responsibility. Canon 4 codifies the time-honored rule which prohibits lawyers from revealing the confidences and secrets of a client or former client. Courts have long recognized in enforcement of Canon 4 through attorney disqualifications that it defeats the purpose of the rule to require either the former client or the court to point to the specific confidences entrusted to the now adverse lawyer:
 
 
 68
 To compel the client to show, in addition to establishing that the subject of the present adverse representation is related to the former, the actual confidential matters previously entrusted to the attorney and their possible value to the present client would tear aside the protective cloak drawn about the lawyer-client relationship. For the Court to probe further and sift the confidences in fact revealed would require the disclosure of the very matters intended to be protected by the rule.
 
 
 69
 T. C. Theatre Corp. v. Warner Bros. Pictures, 113 F.Supp. 265, 269 (S.D.N.Y.1953). Consequently, to avoid this dilemma, courts have been virtually unanimous in requiring only that the moving party in a disqualification motion show (1) that there was an attorney-client relationship between the movant and counsel representing the opposing party and (2) that the subject matter of the current suit is "substantially related" to the matters or cause of action of the suspect attorney's prior representation. E. g. Fred Weber, Inc. v. Shell Oil Co., 566 F.2d 602, 607-08 (8th Cir. 1977), Cert. denied, 436 U.S. 905, 98 S.Ct. 2235, 56 L.Ed.2d 403 (1978); Wilson P. Abraham Construction Corp. v. Armco Steel Corp., 559 F.2d 250, 252 (5th Cir. 1977); Akerly v. Red Barn System, Inc., 551 F.2d 539, 544 n. 12 (3d Cir. 1977); Schloetter v. Railoc of Indiana, Inc., 546 F.2d 706, 710 (7th Cir. 1976); NCK Organization Ltd. v. Bregman, 542 F.2d 128, 132-33 (2d Cir. 1976); Redd v. Shell Oil Co., 518 F.2d 311, 315 (10th Cir. 1975). Once these two facts have been shown,
 
 
 70
 (t)he Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into their nature and extent.
 
 
 71
 T. C. Theatre Corp. v. Warner Bros. Pictures, supra at 268. Accord Schloetter v. Railoc of Indiana, Inc., supra at 710.
 
 
 72
 It is important to note that the reason the courts have created this presumption of counsel possessing confidential information is to prevent the Possible use of those confidences or secrets against the former client. This approach preserves the interest of the former client in the specific information as well as the public interest in encouraging clients to freely "make known to their attorneys all facts pertinent to their cause." T. C. Theatre Corp. v. Warner Bros. Pictures, supra at 269 (footnote omitted). Limiting the inquiry to determining whether a possibility exists that confidential information might be used against a former client also avoids a nightmarish enforcement situation which would be caused by forcing the actual use of confidences to be shown by the moving party or somehow gleaned from In camera inspection by the court.[3] Lengthy experience with this most basic ethical rule has convinced numerous courts that when an attorney represents a party in opposing a former client on a matter substantially related to the previous relationship, the Possibility of the attorney using confidential information against his former client exists and the lawyer must be disqualified. E. g. Akerly v. Red Barn System, Inc., supra at 544; NCK Organization Ltd. v. Bregman, supra at 134; In re Yarn Processing Patent Validity Litigation, 530 F.2d 83, 89 (5th Cir. 1976). The term "presumption" in this context is merely a label given to the recognition of the great possibility of confidential information being used against the former client when this particular situation (counsel opposing former client in a substantially related matter) is present in the case.
 
 
 73
 B. Application to Postdisqualification Situations.
 
 
 74
 It is in choosing the ethical principles to be applied in deciding the work product question that the majority, in my opinion, makes its basic mistake. The majority interprets certain language in the district court opinion as indicating that the trial judge felt a denial of access to predisqualification work product automatically follows from an order of disqualification. (Maj. Op. at 204.) In order to avoid this "per se" rule, the majority finds it necessary to completely disassociate the disqualification and work product questions.[4] The error occurs when, in the process of emphasizing the need to separately analyze the two questions, the majority applies completely different ethical principles to the disqualification and work product issues.
 
 
 75
 To the extent that the language of the lower court which was quoted by the majority could be interpreted as creating a rule that disqualification automatically necessitates a denial of access to predisqualification work product in all cases, I would also view the district court's reasoning as impermissibly broad.[5] However, the district court properly noted that, upon the facts of this case, permitting substitute counsel to have access to Foley & Lardner's work product would be a
 
 
 76
 direct violation of the Purpose behind disqualification; that is the preservation of the confidence of the former client given in the context of the fiduciary relationship he forged with his attorney.
 
 
 77
 74 F.R.D. at 627 (emphasis added). It is my belief that although the disqualification and work product issues can and should be separately analyzed, the general ethical principles which guide the disqualification of attorneys under Canon 4 should also guide subsequent proceedings relating to prior counsel's predisqualification work product. To ignore those principles in later proceedings would, in some circumstances, allow the use of the precise confidential information which prompted the disqualification. The first question, then, is whether there is any reason for the general Canon 4 disqualification analysis (a former attorney-client relationship plus a substantially related current action equals a possible disclosure of confidence and, consequently, disqualification) to somehow change when these ethical principles are applied to the use of predisqualification work product.
 
 
 78
 There can be no question that the second factor in the Canon 4 equation does not change since the finding in the disqualification action that the present suit is substantially related to the prior representation applies with equal force to a subsequent work product motion in the same action. However, it can be argued that the first factor, the attorney-client relationship, is somewhat attenuated (I. e., the objectionable representation is eliminated or lessened when the lawyer or law firm is no longer physically present and only the work product created before disqualification remains). The majority apparently takes the position that the physical absence of counsel necessitates a showing that specific confidential information actually exists in the work product before the documents can be suppressed. This is a direct reversal of the longstanding practice in disqualification questions which has consciously avoided inquiries into the actual confidences or secrets used or possessed. Having enforcement of ethical principles turn on whether the courts or the plaintiff can actually point to specific confidential information is precisely the type of inquiry the prophylactic rule embodied in Canon 4 was designed to prevent.
 
 
 79
 As noted above, the purpose of presuming the possession of confidences in disqualification cases is that once a former attorney-client relationship in a substantially related case is established, the possibility of confidential information being used against the former client is too great to allow continued representation. The issue has always been one of whether counsel had the opportunity to obtain and use confidences, not whether specific confidences were actually used. Consequently, the question here should be whether the physical removal of counsel from the case, while leaving his work product, eliminates or greatly lessens the Possibility of confidential information being used against his former client.
 
 
 80
 It should be emphasized that proper application of this test would not result in a Per se exclusion of work product each time a lawyer or law firm is disqualified for violating Canon 4.[6] The present client and substitute counsel would be able to use the predisqualification work product whenever there was little or no possibility that confidences or secrets could be used against the former client/present adversary. One example of such a case would be where the conflicting representation arose after the work product in question was generated (E. g. the law firm representing one party hires a lawyer who represented the opposing party in matters substantially related to the present suit but only after several months of pretrial discovery and generation of work product). In such a case, there would be no possibility that the confidences possessed by former counsel could have been used to prepare the work product or been passed to substitute counsel through the work product.[7] Also, under this rule, where the work in question is of the type that is so ministerial And easily available for inspection (E. g., pleadings and other filed documents) that the possibility of confidences being used to disadvantage the former client are minuscule, the district court could allow the use of the work.[8] The validity of these "timing" and "type" examples would, of course, depend upon the facts of each case. Having postdisqualification work product cases turn upon whether there exists a reasonable possibility of confidential information being used in the formation of, or being passed to substitute counsel through, the work product in question, provides a flexible rule which can be readily used by the district courts and adheres to the principles embodied in Canon 4 and the disqualification decisions.
 
 
 81
 C. Application to Facts of this Case.
 
 
 82
 Applying the test noted above to the instant case, it is clear that there is a great possibility that confidential information is either present in Foley & Lardner's work product or was used in the creation thereof. Indeed, it is difficult to imagine a situation more replete with the confidences and secrets which Canon 4 was designed to protect. To support that conclusion we need only compare the nature of the former legal representation to the issues raised in the present suit. As the court below noted in its disqualification order, 422 F.Supp. 493, 494-98, Foley & Lardner served as general counsel to all defendants And plaintiff simultaneously from plaintiff's inception on November 3, 1971 until September 4, 1974. During this time, Foley & Lardner advised plaintiff on its creation and adoption of its Declaration of Trust; on its adoption of the Advisory Agreement defining the relationship between plaintiff and its loan advisor, defendant First Wisconsin Mortgage Company; on its use of Participation Agreements which defined the relationship between the plaintiff and defendant First Wisconsin National Bank regarding the real estate loans; and on the actual administration of some of the loans which are the subject of specific claims in the underlying suit. Foley & Lardner also attended and kept the minutes of all plaintiff's Trustees' meetings at which the loan advisor recommended investments and the Trustee decided whether or not to accept the recommendations.
 
 
 83
 In comparison with this detailed legal representation, plaintiff's complaint includes allegations that defendants failed to disclose material information relating to plaintiff's investments and that defendants breached contractual and fiduciary duties arising from the various relationships noted above. Thus, looking at the similarity between Foley & Lardner's prior legal representation and the issues in this suit, the conclusion that there was a possibility of Foley & Lardner using confidential information in its work on this case is inescapable. The work product here, loan file analyses, was generated by Foley & Lardner with an eye toward the issues of the present suit and was based upon a relationship with both plaintiff and defendants which gave Foley & Lardner access to the innermost workings of plaintiff's organization and the opportunity to observe first hand the discussions and decisions relevant to the issues in this case.[9]
 
 
 84
 While it should be unnecessary in applying Canon 4 to speculate as to the specific confidences which may have been used by disqualified counsel, I feel constrained, in this dissenting opinion, to specify some of the confidential information which possibly could be embodied in the work product. One example of confidential information which possibly could be Passed through the work to substitute counsel is, given that some of the underlying claims are grounded in securities law, that Foley & Lardner knew the reaction of plaintiff's Trustees to specific loan offerings and the amount of their reliance upon the representations of defendants in relation thereto. Foley & Lardner could have used those insights in determining what facts in the loan files were important and should be highlighted in the analyses. Moreover, the possibility of using confidential information to Create the work product is even more obvious. It is unnecessary to step outside the record to note that the lucidity and usefulness of the work product is immeasurably enhanced by Foley & Lardner's intimate knowledge of plaintiff's internal operations, particularly with regard to the transactions involved in the suit. Being present at the plaintiff's Trustees' meetings and observing the manner in which the subject loans were approved would enable Foley & Lardner, if nothing else, to analyze the loan files with much greater specificity and emphasize particular or recurring names, dates, or correspondence.[10]
 
 
 85
 Once recognizing that the work product in this case possibly contains or is based upon confidential information, the impropriety of allowing its continued use by defendants is evident. The ability of defendants' substitute counsel to discern from the loan file analyses a special emphasis upon particular loans and particular information relating to those loans is, at least, a distinct possibility in this case where Foley & Lardner was inextricably interwoven in the subject relationships. Also, substitute counsel's reliance upon certain factual conclusions drawn by Foley & Lardner in the work product will surely be heightened by the knowledge that those who prepared these documents were in an exceptional position to make those conclusions. Yet it is not only possible, but highly probable, that this confidential knowledge which is the basis for the work product would not be apparent to an outsider such as a trial judge who likely could select only a portion of the work to inspect In camera. Even if the district court reviewed each and every loan file analysis, as well as the loan files themselves, it would not have the time for in depth and ongoing study as would substitute counsel once the work product was turned over.
 
 
 86
 Although I have specified some of the particular types of confidences and secrets which might be passed through, or used to create, the predisqualification work product, I emphasize that all of this could be transmitted by Foley & Lardner's work, and received and used by substitute counsel, without any cognitive notion of either law firm to act improperly or unethically.[11] As noted in Emle Industries, Inc. v. Patentex, Inc., supra note 3, subtleties exist both on the level of the lawyer's relations with his client and on the level of his role in the litigation process. The nature and content of these subtle relationships are incalculable and have been so recognized by the courts applying the ethical rule to preserve the confidences and secrets of a former client:
 
 
 87
 The rule prevents a lawyer from placing himself in an anomalous position. Were he permitted to represent a client whose cause is related and adverse to that of his former client he would be called upon to decide what is confidential and what is not, and, perhaps, unintentionally to make use of confidential information received from the former client while espousing his cause. Lawyers should not put themselves in the position "where, even unconsciously, they might take, in the interests of a new client, an advantage derived or traceable to, confidences reposed under the cloak of a prior privileged relationship."[12]
 
 
 88
 I am convinced there exists a significant possibility that confidences were used in the work product in this case.
 
 
 89
 Nevertheless, the majority disregards available precedents which clearly show that the prudent course when doubt is present is to opt for the more careful enforcement of ethical rules. See R. Wise, Legal Ethics 256 (2d ed. 1970). As stated above, I do not believe the doubt in this case can be removed by remand to the district court for In camera inspection and/or a hearing. Choosing a more permissive interpretation of the ethical rules which allows substitute counsel access to predisqualification work product of Foley & Lardner is an irreversible decision. The right of plaintiff not to be forced to litigate against the information and experience of its former general counsel regarding the very issues of this suit is lost once the work product is given to substitute counsel. On the other hand, defendant concedes that the basic work can be redone by substitute counsel. Consequently, the loss to defendants is temporary in terms of time and possibly recoverable in terms of previously paid attorney's fees.[13] Under these circumstances, proper adherence to the principles of Canon 4 commands affirmance.
 
 III. Canon 9
 
 90
 As the foregoing discussion of Canon 4 shows, it is my belief that the possible breach of the ethical principles requiring preservation of the confidences and secrets of former clients is sufficient to justify denying substitute counsel access to Foley & Lardner work product. However, even if it were possible to draw fine distinctions in the content of the materials to be turned over to substitute counsel, thus avoiding a Canon 4 violation, permitting access to disqualified counsel's work in this case would also constitute a violation of Canon 9's admonition that "A lawyer should avoid even the appearance of professional impropriety."
 
 
 91
 Understandably, courts have shown considerable caution in using Canon 9 for fear of overly-broad applications of the potentially far-reaching rule. Nonetheless, a certain agreement has been reached on the application of Canon 9. It is settled that the rule is directed toward
 
 
 92
 maintaining, in the public mind, a high regard for the legal profession. The standard it sets I. e., what creates the appearance of evil is largely a question of current ethical-legal mores.
 
 
 93
 General Motors Corp. v. City of New York, 501 F.2d 639, 649 (2d Cir. 1974). Consequently, unlike the specific admonitions of Canons 4 and 5, Canon 9 covers the entire spectrum of lawyer conduct, including the attorney-client relationship itself and its residual obligations. Fred Weber, Inc. v. Shell Oil Co., supra at 609. Also, since the Appearance of improper conduct is emphasized, proof of actual impropriety is unnecessary and the act in question must be prevented if it appears improper when evaluated in an " 'eye of the beholder' context." Id.[14] Of course, we should not apply the sanctions of Canon 9 based upon the attitudes of the "most cynical members of the public," and most courts have emphasized that flexibility is necessary by way of balancing public suspicion against the benefits to be gained by allowing the act in question. Woods v. Covington County Bank, supra note 8 at 813.[15] Therefore, to properly apply Canon 9 we must ask whether reasonable members of the public would view access to predisqualification work product as being improper and, if so, whether the benefit of permitting such access outweighs the harm to the public trust.
 
 
 94
 It does not appear to me that the average person would approve of allowing disqualified counsel's work to be used against its former client on the facts of this case. It is possible that the appearance of impropriety might be somewhat lessened by the physical removal of the Foley & Lardner firm. However, I believe the public would be at least disheartened by the knowledge that although a lawyer who deserts a former client can be disqualified, the attorney can still turn over all of his work to substitute counsel. Popular belief in the strong fiduciary relationship between attorneys and their clients would undoubtedly be shaken when the clients realized that the lawyer whom they once took into their strictest confidence and in whom they placed ultimate trust on the very matters at issue in the case is permitted to prepare the secret materials which are now being used by the opposing party in the suit.
 
 
 95
 I also believe that this loss of public trust outweighs the harm to defendants of having to pay additional legal fees. In any event, the defendants' interest in avoiding double payment is lessened given the potential resolution of the fees question between the defendants and the disqualified law firm. The strength of defendants' interest is further weakened by the fact that they were aware of the potential impropriety and yet encouraged Foley & Lardner to continue on the case. (R: 7, Shute Affid. 8-9.)
 
 
 96
 I therefore conclude that Canon 9 would also be violated, in this case, by permitting substitute counsel to have access to the work prepared by Foley & Lardner. On these facts, a holding which allows Foley & Lardner work product to be used later against the disfavored client will certainly not encourage attorney conduct which will "inspire the confidence, respect and trust of his clients and of the public . . . ." EC 9-6.
 
 IV. Effects of Majority's Decision
 
 97
 Underlying the majority's decision in this case is apparently a concern that the practical impact of the panel decision outweighs any "technical" violation of ethical rules. As stated above, I believe the ethical violation here to be far more substantial than does the majority. However, I am also deeply troubled by the practical effects of the majority's position.
 
 
 98
 The majority seems convinced that denying substitute counsel access to predisqualification work product merely serves to give the plaintiff a "gamesmanship headstart" in the litigation.[16] While this position ignores the possible ethical violations which would be prevented by denying such access, it also overlooks the "gamesmanship" effect of its own result. By requiring that specific confidences be found before access to predisqualification work product can be denied, the majority has encouraged law firms which are the actual or possible targets of disqualification motions to manufacture as much work product as time permits before disqualification. If the law firm is subsequently disqualified, its continuing influence in the case will be ensured by substitute counsel's use of the predisqualification materials. It is conceivable, and perhaps likely, that certain large clients who have been long represented by a single law firm would be willing to risk paying double legal fees in return for the possibility of using prior counsel's work throughout the course of the litigation. As noted by the district court, this form of continued representation by disqualified counsel could result in almost total circumvention of the disqualification order. 74 F.R.D. at 627.
 
 
 99
 I recognize that some motions for disqualification or other sanctions based upon ethical rules are brought exclusively for harassment purposes and serve to further complicate long and complex litigation. See Woods v. Covington County Bank, supra at 813. However, while instant credibility determinations would be the ideal resolution, where that is not possible courts should not completely ignore the underlying ethical problems. By concentrating totally on the impact of the panel decision upon the defendants in this case, the majority has not properly considered the ethical problems involved and, consequently, the harm to the plaintiff in having to litigate against the work of its former general counsel on the precise subject of that representation.[17]
 
 
 100
 I also note that one effect of the majority opinion may be a departure from the long-settled rule in disqualification questions that an attorney's possession of actual confidences need not be shown where there was a former attorney-client relationship in a substantially related matter. Were other courts to have the same difficulty I experience when attempting to distinguish between the ethical rules to be applied in disqualification situations and those applicable to postdisqualification questions, the result might well be a refusal to disqualify counsel unless the former client could point to specific confidences or secrets which could be used by the opposite party in the suit. Such a rule would poorly serve the intent of Canon 4 and would ultimately lead to a hesitation by clients to fully confide in their counsel.
 
 
 101
 Finally, I note that it has been generally accepted in this Circuit and in others that the decision of the district court regarding enforcement of ethical standards can be overturned only for a clear abuse of discretion. E. g., Schloetter v. Railoc of Indiana, supra at 710. Under this standard, the majority holds that unless the district court can point to some specific confidence breached, it is an abuse of discretion not to allow substitute counsel access to predisqualification work. Given the near impossibility of determining what is and is not confidential information, the effect of such a holding on the facts here will as surely create a Per se right to work product access as had the majority specifically so stated. Lower courts will look to the particularly egregious facts here and reason that if it is an abuse of discretion to deny access in such a situation, then it surely will be an abuse of discretion to deny access when, as would be the more common case, the disqualified law firm was not general counsel to both parties and involved in the very transactions at issue. This result is particularly disturbing given that, in a case similar to the present, the majority's result will consistently work against the disfavored client who presumably will always be the smaller and less important to the law firm. Large clients, as well as large firms, should not be shielded from the results of properly applied ethical principles. Cf. Westinghouse Electric Corp. v. Kerr-McGee Corp., supra at 208.
 
 
 102
 I emphasize that while this dissent attempts to articulate the legal standards applicable to this type of ethical question, it is not my intention to advocate any rigid or Per se rules. The enforcement of ethical principles is peculiarly a matter for the district court and requires careful weighing of the facts and circumstances of each case. See Akerly v. Red Barn System, Inc., supra at 544; Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., 518 F.2d 751, 757-58 (2d Cir. 1975). Our function as an appellate court should merely be to ensure that the factual analysis is properly conducted and the ethical principles correctly applied. On the facts of this case, not only is there nothing to suggest an abuse of discretion by the district court, but in so holding the majority is, in my opinion, creating new and improper legal standards to guide future cases.
 
 
 103
 By way of summary, I will answer the eight paragraphs of "undesirable results," quoted by the majority at pages 208-209, which the defendants believe will flow from the position taken by the panel opinion and this dissent.
 
 
 104
 1: The possibility of improperly using the confidences or secrets of plaintiff, not the fault of the defendants, is the primary reason to deny substitute counsel access to the work product. Note 16 Supra. However, there are indications of some fault on the part of defendants here. Note 13 Supra.
 
 
 105
 2: There is a possibility of confidential information being passed through or used to create the work product in this case. This, and not the showing of actual confidences, is the proper test. Pages 213-219 Supra.
 
 
 106
 3: There are no Per se rules advocated. If anything, the dissent allows for complete consideration of the relevant circumstances within the framework of district court discretion. Page 222 Supra. The extent, if any, to which plaintiff caused any of the work product to be generated is hotly disputed and a matter peculiarly within the discretion of the district court.
 
 
 107
 4: The moratorium argument is not very persuasive in this case where Foley & Lardner was aware both of the significant potential for disqualification and of possibly being unable to turn over the work product from the outset of the case. (R: 36:2.) In any event, expediency should not prevent proper adherence to ethical standards. Note 17 Supra.[18]
 
 
 108
 5: Defendants' hardship, in this case, does not weigh favorably against forcing plaintiff to litigate against the secret materials prepared by its former counsel. Page 219 and note 13 Supra.
 
 
 109
 6: If anything, the position of this dissent would encourage the public to fully confide in their lawyers by ensuring that no possible use of those confidences could be made by the lawyer for the benefit of another, more favored, client. Pages 219-221 Supra.
 
 
 110
 7: The benefit to plaintiff is in the assurance it will not have to litigate against the confidences possessed by a former attorney. This outweighs the financial harm, if any, to defendants. Page 221 & note 16 Supra.
 
 
 111
 8: Discipline of counsel is an effect of, but not the primary purpose for, both disqualification and the denial of access to work product. Defendants presumably have recourse against disqualified counsel for lost legal fees. Note 13 Supra.
 
 
 112
 It is with great respect, but with equally great conviction, that I offer these dissenting views.
 
 
 
 [1]
 Throughout this litigation, the parties and the district court have used the generic term "work product" to describe the written work which the defendants desire their present counsel to receive and which the plaintiff contends should not be delivered, a position accepted by the district court. While "work product" as a term probably encompasses substantially broader and more legally sophisticated writings than the routine analyses here in controversy, See Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), we shall use the term here for convenience of reference
 
 
 [2]
 We express no opinion as to whether the correctness of the disqualification order can properly be raised as an issue after final judgment in this case in the district court, and if it can, even if it were not a proper case for disqualification, whether the ruling could at that juncture constitute reversible error
 
 
 [3]
 Paradoxically, despite the strengthening of professional ethical standards in some areas there has been a retrenchment in other areas from standards which had long been considered inviolable. Thus, advertising, direct or indirect, was condemned as unprofessional. American Bar Association, Canon 27, Canons of Professional and Judicial Ethics (1957). Some lawyer advertising now, it has been determined, enjoys First Amendment protection. Bates v. State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). More recently the House of Delegates of the American Bar Association broadened ethically permissible advertising to include the television media
 
 
 [4]
 The majority opinion of the original three-judge panel in the present case noted that Hutton "seems to be distinguishable," but also held that to the extent it was indistinguishable from the present case, "we decline to follow its conclusion," agreeing with the district court that allowing access to the legal work of disqualified counsel negates the effect of the disqualification order. 571 F.2d at 398. We, of course, do not agree that this result inexorably must follow without regard to the particular circumstances
 
 
 [5]
 We regard the proposal of Trust during this litigation that the work product be also turned over to it as being merely a variation of a sanction against the client and decline to consider such treatment appropriate in this case
 
 
 [6]
 Because of the result we have reached in this case, and in view of the likelihood of a wide range of factual situations occurring which will require a determination of the work product issue on a case-by-case basis, we have deemed it unnecessary to set forth the nature of the examination which a trial judge should make other than to say that the judge should be satisfied that there is no taint of confidentiality or other improper advantage gained from the dual representation. The determination might well involve an in camera examination
 
 
 [1]
 The only evidence remotely supporting that assertion is contained in affidavits filed by certain Foley & Lardner partners in opposition to the original disqualification motion. These affidavits stated that all information given to Foley & Lardner by plaintiffs regarding this suit was given in the presence of officers from one or more of the defendants (McGaffey Affid., P 9; Shute Affid., P 10). While this might eliminate any claim of attorney-client privilege to confidential information, as noted in the following textual paragraph, the question of attorney-client privilege is not at issue here
 
 
 [2]
 The Disciplinary Rules accompanying Canon 4 provide a helpful definition of terms:
 DR 4-101 Preservation of Confidences and Secrets of a Client.
 (a) "Confidence" refers to information protected by the attorney-client privilege under applicable law, and "secret" refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.
 In this dissent, "confidences" or "confidential information" are intended to refer generally to that type of information protected by Canon 4 including "secrets" not privileged under the laws of evidence.
 Perhaps the majority is overlooking that protection is to be given to "secrets" as well as "confidences." As will be more fully explained in Part II below, Foley & Lardner's intimate familiarity with the plaintiff's internal handling of the transactions at issue in this suit is a sufficient reason to conclude that there is a great possibility those insights or "secrets" were the basis for, or were carried into, the work product.
 
 
 [3]
 See Part II.C. Infra. Such an inquiry would be thwarted by the difficulty in determining what is confidential and by the difficulty in totally exorcising the effects of any such confidences from the litigation. The latter problem is compounded by the subtle nuances of both the litigation process and the attorney's influence thereon
 The dynamics of litigation are far too subtle, the attorney's role in that process is far too critical, and the public's interest in the outcome is far too great to leave room for even the slightest doubt concerning the ethical propriety of a lawyer's representation in a given case. These considerations require application of a strict prophylactic rule to prevent any possibility, however slight, that confidential information acquired from a client during a previous relationship may subsequently be used to the client's disadvantage.
 Emle Industries, Inc. v. Patentex, Inc., 478 F.2d 562, 571 (2d Cir. 1973); See also T.C. Theatre Corp. v. Warner Bros. Pictures, supra at 269.
 
 
 [4]
 For general support of this approach, the majority cites two lower court opinions which granted disqualification but allowed substitute counsel to use certain materials possessed by disqualified counsel. (Maj. Op at 206-207.) Both of these cases are factually distinct from the present action. Hutton involved factual statements obtained from a corporate officer and not legal analysis of those facts as is the question involved here. 305 F.Supp. at 400. Allied Realty involved only material which had already been made public
 
 
 [5]
 It is, of course, proper for an appellate court to affirm the result reached by the district court but for reasons other than those relied upon below. See Helvering v. Gowran, 302 U.S. 238, 245, 58 S.Ct. 154, 158, 82 L.Ed. 224 (1937) ("if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason.")
 
 
 [6]
 The majority notes that the only circuit court to have cited the panel decision in this case disagreed with the result reached. International Business Machines Corp. v. Levin, 579 F.2d 271 (3d Cir. 1978) (IBM ). If anything, the Third Circuit emphasized the limited extent of the First Wisconsin panel opinion in its one-line reference thereto in IBM. (Maj. Op. at 208.) However, some discussion is warranted
 In IBM, plaintiff's attorneys in an antitrust action against IBM were disqualified by the trial court after it was discovered that the law firm simultaneously represented IBM in certain labor matters. The Third Circuit affirmed the disqualification, finding that Canon 5 was violated and that the district court did not abuse its discretion in allowing disqualified counsel's work product to be turned over to substitute counsel.
 I fully agree with the result in IBM v. Levin and feel that case merely serves to highlight the need for affirmance here. First, the court in IBM found the simultaneous representations were unrelated and that the primary justification for disqualification of the law firm under Canon 5, "vindication of the integrity of the bar," 579 F.2d at 283, was fully satisfied without preventing access to predisqualification work product. Canon 4 and Canon 5 are aimed at different ethical considerations. In IBM, the purpose of DR 5-105, to ensure undivided loyalty, was not violated by allowing plaintiff's substitute counsel to use the work product. The work product was created for the antitrust plaintiff, while the "adverse effect" to IBM referred to the unrelated labor matters. Allowing substitute counsel in the antitrust suit to use the work product would not have any further "adverse effect" on IBM. In contrast, we are concerned here with Canon 4. The purpose of Canon 4, to prevent the possible use of confidences and secrets against a former client, remains in substantial jeopardy as long as prior counsel's work product is used in this suit.
 Second, the court in IBM emphasized that a district court's action in framing ethical sanctions "may be reversed only for a clear abuse of (its) discretion." 579 F.2d at 279. The Third Circuit noted that the disqualification motion was made by IBM three months before trial. This was five Years after the suit was filed and followed nearly three Years of extensive discovery. 579 F.2d at 274, 275. Under these circumstances, the Court of Appeals found it was not an abuse of discretion to allow the work product turnover. See note 8 Infra. In the present case, the disqualification issue was raised shortly after the suit was filed and, consequently, the relative hardship is not so great as to find that the district court abused its discretion in refusing to permit the requested access.
 
 
 [7]
 There is nothing in the present record which suggests that the opportunity to include confidential information in the work product or use confidences in the creation thereof was in any way diluted by the timing of the creation of the work product. Foley & Lardner was subject to disqualification from the inception of the suit (the district court disqualified the firm Ab initio ) and, as such, all work on this case was done during the time when there was a possibility of plaintiff's confidences being used in the creation of work product
 
 
 [8]
 The status of the pleadings and other documents filed by Foley & Lardner is not at issue in this case. Although I admit that some consideration can be given to the type of predisqualification work sought to be used by substitute counsel, this position is not inconsistent with my view that access to the work product in this case was properly denied. The question, first of all, should be left to the sound discretion of the trial judge who is in the best position to gauge the possibility that the documents sought were based upon or contained confidential information. For example, it has been noted that some motions which ostensibly seek to enforce ethical rights and duties are actually based upon a desire to harass the opponent in litigation. See Woods v. Covington County Bank, 537 F.2d 804, 813 (5th Cir. 1976). Thus, where the timing or manner of the objection to the use of prior counsel's pleadings, etc. together with the routine content of these documents convince the trial judge that the former client is attempting to harass substitute counsel or the opposing party, allowing continued use of these papers might be proper. That the plaintiff in this case did not seek total eradication of all Foley & Lardner work indicates its sincerity and lack of improper motive
 Second, documents such as pleadings and answers to interrogatories which are in the record are less dangerous to the interest of the former client in preserving his confidences. Disqualified counsel naturally would be reluctant to include facts or other information which could only have been obtained in confidence from his former client. Moreover, should the former client feel the documents contain or are based upon specific confidences or secrets which disqualified counsel obtained during their previous attorney-client relationship, he could move to strike the suspect documents. While support of this motion might entail revealing the individual confidences which the former client fears are contained in the documents, See T.C. Theatre Corp. v. Warner Bros. Pictures, supra at 269, it would at least be better than giving the court a general list of possible confidences in order to suppress secret work product which is unavailable to the opposing former client.
 I emphasize that questions as to the pleadings and other filed documents are not before the court in this case and depend upon factual variations which are best left to the discretion of the district courts who can view them in the context in which they arise.
 
 
 [9]
 In fact, it was also alleged by plaintiff as an original ground for disqualification that members of Foley & Lardner might even be called to testify in the suit. 422 F.Supp. at 495
 In spite of the obvious possibility of confidential information being used in such circumstances, in Part IV of its opinion, the majority states that plaintiff "was in a position to know whether such possibilities existed" and criticizes plaintiff's counsel for not enumerating specific contentions. (Maj. Op. at 210.) Requiring the former client to divulge precisely what confidential information may be contained in the work product would result in revealing the very information sought to be protected. T.C. Theatre Corp. v. Warner Bros. Pictures, supra at 269.
 
 
 [10]
 I realize that normally this type of work is done by younger associates of the large law firms involved who would be less likely to have had the intimate relationship with plaintiff described above. However, the possibility, or more likely the probability, exists that this analysis was performed under the direction of and with instructions from those more senior attorneys who did possess that inside knowledge. In any event, we cannot base an important ethical decision upon the distinction as to which members of a law firm are likely to have access to the knowledge concededly possessed by other members. See Schloetter v. Railoc of Indiana, Inc., supra at 710
 
 
 [11]
 As stated in the majority panel decision, we are dealing with reputable law firms and there is no indication that any deliberate improprieties have occurred
 
 
 [12]
 T.C. Theatre Corp. v. Warner Bros. Pictures, supra at 269 (footnote omitted). This quotation is particularly relevant to the majority's assumption that the materials being sought here are "the result of routine lawyer work" which could have been done entirely "by lawyers who were strangers to all of the parties." (Maj. Op. at 204.) Aside from the lack of record support for that assumption, in the dynamics of legal representation, it is impossible to guarantee the "routineness" of the type of secret legal analysis done here
 
 
 [13]
 The responsibility for any "lost" legal fees incurred in the preparation of the work in question is a matter between Foley & Lardner and defendants. The district court found that Foley & Lardner had doubts as to the propriety of their continued representation of defendants at least as early as two days after the suit was filed. 422 F.Supp. at 495. However, defendants apparently urged Foley & Lardner "to do everything possible to remain as their counsel in this case." (R: 7, Shute Affid. 8-9.) Thus, it appears that neither the defendants nor Foley & Lardner are totally without fault for causing unusable legal work to be created. Their relative culpability is not our concern here
 
 
 [14]
 Judge Kaufman's statement, drawn from eminent authority, is particularly relevant here:
 Nowhere is Shakespeare's observation that "there is nothing either good or bad but thinking makes it so," more apt than in the realm of ethical considerations. It is for this reason that Canon 9 of the Code of Professional Responsibility cautions that "A lawyer should avoid even the appearance of professional impropriety" and it has been said that a "lawyer should avoid representation of a party in a suit against a former client, where there may be the appearance of a possible violation of confidence, even though this may not be true in fact." American Bar Association, Standing Committee on Professional Ethics, Informal Opinion No. 885 (Nov. 2, 1965).
 Emle Industries, Inc. v. Patentex, Inc., supra, note 3 at 571.
 
 
 [15]
 This is not to say that the balancing of competing interests is foreclosed in the Canon 4 analysis. Under that canon, courts can and should weigh the interest of the former client in preserving its confidences and secrets against the potential harm to the present client. As noted above, the temporary loss, if any, to defendants does not outweigh the permanent injury to plaintiff who would have to oppose the legal analysis prepared by its former counsel
 
 
 [16]
 Correspondingly, Judge Pell's original dissent dismissed plaintiff's offer to allow substitute counsel to have access to the materials as long as plaintiff was also given access, as merely an attempt by plaintiff to receive valuable legal work without having to pay therefor. However, as with the pleadings and other documents, at least when the materials are available to the disfavored client there is an opportunity to examine them and take action to protect specific confidences. See note 8 Supra
 Similarly, the En banc majority emphasizes that denying substitute counsel access to the predisqualification work product serves to penalize the defendants "irrespective of any fault on the part of the party litigant." (Maj. Op. at 205.) I agree with the proposition that in ethical questions, equitable principles demand consideration of all factors in order to do substantial justice. However, as noted above, it appears that defendants are not entirely free from fault in this case. See note 13 Supra. In any event, the purpose of denying access to the work is not to penalize the defendants but, more importantly, to protect the plaintiff specifically and the public generally.
 
 
 [17]
 The majority is particularly concerned that denying access to predisqualification work product will effectively cause a moratorium upon trial preparation during the resolution of what possibly could be a frivolous disqualification motion. (Maj. Op. at 204-205.) As an example, the majority emphasizes that, in this case, it took 15 months from the time the motion for disqualification was filed until Foley & Lardner was ordered disqualified. As noted above, ordering disqualification does not automatically necessitate a denial of access to work product. However, when denial is warranted, the desire to expedite final resolution of the case should not prevent proper enforcement of ethical principles
 Interestingly, the majority states that the district court should give appropriate weight to the continued generation of work in the face of an obvious basis for disqualification. (Maj. Op. at 205.) In this case, Foley & Lardner was well aware of the conflict of interest situation when, two days after the complaint was filed, it sent a letter requesting plaintiff's consent to its continued representation of defendants:
 (W)e have concluded that Foley & Lardner as a firm can represent (defendants) Providing that the Mortgage Trust consents to our representation of the defendants. . . . (W)e have concluded that, With the consents of the Mortgage Trust and each of the defendants, there is no ethical or other prohibition that precludes us from representing the defendants in the action.
 Quoted at 422 F.Supp. at 495 (emphasis added). While I do not believe Foley & Lardner had no "good faith justification" for continuing to represent defendants, the fact that the firm was aware of the significant ethical problems lessens the weight of the majority's "moratorium" point in this case.
 
 
 [18]
 In response to this dissenting opinion, the majority noted that plaintiff did not request injunctive relief to prevent the production of the work product pending resolution of the disqualification motion. (Maj. Op. at 210.) To the extent this should be a controlling factor, I note that there are indications in the record that both plaintiff And defendants assumed duplication of all Foley & Lardner work product was a possible consequence of disqualification. (R: 36:2.)